**SARKES TARZIAN, Inc.,**
v.
**UNITED STATES of America.**
**No. IP 54-C-11.**

United States District Court
S. D. Indiana, Indianapolis Division.
May 3, 1956.

---

C. B. Dutton, Indianapolis, Ind., Ross, McCord, Ice & Miller, by Wesley A. Dierberger and Merle H. Miller, Indianapolis, Ind., for plaintiff.

Jack C. Brown, U. S. Atty., Indianapolis, Ind., Stephen Leonard, Asst. U. S. Atty., Anderson, Ind., H. Brian Holland, Asst. Atty. Gen., Andrew D. Sharpe and Gilbert E. Andrews, Jr., Attys., Dept. of Justice, Washington, D. C., for defendant.

HOLDER, District Judge.

In this case, the plaintiff instituted suit against the United States of America alleging defendant erroneously and illegally assessed and collected taxes and interest and that it also overpayed taxes for all of which plaintiff asks refund based on its refund claims in the sum of $68,345.22, plus interest, after it abandoned on March 15, 1956, a part of its claim of June 2, 1955, in the amount of $1,710.

Following the filing of the amended complaint and an amended answer thereto, the plaintiff renewed its motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, 28 U.S.C.A., in favor of plaintiff for the reason that the pleadings on file, together with the affidavit of Sarkes Tarzian, President of the plaintiff, and exhibits attached and filed with the motion for summary judgment, showed that there was no genuine issue as to any material fact and that plaintiff is entitled to judgment as a matter of law.

The defendant objects to the granting of plaintiff's motion for summary judgment on grounds that a genuine dispute exists in respect to material facts, and that plaintiff is not entitled to judgment as a matter of law, and defendant filed with its objections, its brief and two affidavits of Gilbert E. Andrews, its trial attorney in the Tax Division, Department of Justice, Washington, D. C., and who serves as one of the attorneys for defendant in this case. Thereafter, defendant filed and propounded its written interrogatories to plaintiff to be answered by a duly authorized officer or

agent pursuant to Rule 33, of the Federal Rules of Civil Procedure, which were answered under oath in writing by plaintiff's attorneys and filed with the Court.

█ This Court will disregard the affidavits of defendant's attorney under Rule 56(e) of the Federal Rules of Civil Procedure as such was not made on personal knowledge, nor did it set forth facts as would be admissible in evidence and did not affirmatively show that the affiant attorney was competent to testify to the matters stated therein. No issue of fact was presented from defendant's objections, affidavits, interrogatories, answers thereto and brief in the summary judgment proceeding.

Considering defendant's attorney's affidavits under Rule 56(f) of the Federal Rules of Civil Procedure to determine whether defendant could not for reasons stated, present under Rule 56(e) by affidavit, the facts essential to justify its opposition to plaintiff's motion for summary judgment, it is first necessary that I examine the defendant's reasons and I quote the essential and material parts of the first affidavit as follows:

"That the principal issues * *, as shown by the pleadings are whether plaintiff is entitled to any deduction for depreciation on two patent applications, and, in the event that any deduction is allowable, the amount of that deduction. The threshold issue, * * * is whether the patent applications were sold to plaintiff * * * or whether the patent applications were acquired by plaintiff solely in exchange for its capital stock. * * whether * * * an exchange for stock or a sale depends upon the substance of the transaction in terms of what the parties actually accomplished and what they intended to accomplish. This ultimate issue of fact hinges upon a multitude of subsidiary facts, not the symbols or labels employed by the parties to the transaction, or the form in which they chose to cast the trans-

action. *Based upon an examination of the files, containing protests and briefs filed by plaintiff's representatives, reports of Internal Revenue Agents, and other data, and not upon mere suspicion or surmise, affiant believes that the following facts, among others, which cannot now be shown by affidavits, can be shown at the trial:* (Italics mine) * * *.

" * * * the resolution of the ultimate factual issues in this case requires that defendant be afforded an opportunity to cross examine * * * with respect to crucial facts which are peculiarly within their knowledge. Questions of credibility, motive and intent are presented, and demeanor testimony is essential to defendant in the presentation of its case.

" * * * An apportionment of the basis must be made between patent application * * *, with respect to which patent * * * was issued on February 14, 1950, and patent application * * *, with respect to which a patent was not issued. * * *, a further apportionment must be made so that only depreciation subsequent to February 14, 1950, is allowed as a deduction. Underlying these issues is the question of the number of television tuners sold by taxpayer during the taxable year ending June 30, 1950, and the date and selling price with respect to each sale, together with similar data in regard to any licensees. All of these facts are peculiarly within the knowledge of taxpayer and obviously are not susceptible of presentation by way of affidavit."

and I further quote the essential and material parts of the second affidavit as follows:

"*Based upon additional information * * * depositions of Sarkes Tarzian, Donald Duck, Charles Clapham and Robert L. Floyd taken at Indianapolis, Indiana on April 19*

*and 20, 1956,* it is believed that the following facts, which cannot presently be shown by affidavit, can be shown at the trial. These facts are believed to support defendant's position that a genuine dispute exists between the parties in respect to material facts, including the issue as to whether or not the acquisition by plaintiff on September 1, 1949, of patent applications numbered 16771 and 772773 was or was not a purchase: \* \* \*." (Italics mine.)

The defendant on March 23, 1956, requested the Court for an order for continuance which was granted to permit it to obtain affidavits, or depositions, or discovery, or for any other just order in aid of defendant in the summary judgment proceedings. The defendant thereafter propounded the said interrogatories and received the said answers thereto which have been filed with this Court. The defendant as recited in its affidavit filed April 30, 1956, had at its disposal, written depositions of Sarkes Tarzian, Donald Duck, Charles Clapham and Robert L. Floyd, which depositions were not offered in support of defendant's position. The defendant has not requested any further order for a continuance to permit it to obtain affidavits, or depositions, or discovery, or for any other just order in aid of defendant in the summary judgment proceedings and the Court sees no just cause to further volunteer a continuance since this action has been on file since October 4, 1954.

The plaintiff under Rule 56(a) and (c) in view of the controverted pleadings chose to support its motion for summary judgment with affidavits of its President, its Accountant, and its Controller and Assistant Treasurer and exhibits of records of the plaintiff and not rely solely upon the admissions of the pleadings only. If the plaintiff has made a substantial factual prima facie showing that there is no genuine issue of fact by its motion for summary judgment and supporting affidavits and exhibits, then the burden of proceeding under said Rule 56 would be upon the defendant. If the admissions of the pleadings did not disclose that there was a genuine issue of a material fact and law, then the defendant cannot stand silently by without submitting affidavits of fact under Rule 56(e) that would disclose there is a genuine issue of a material fact and law or by affidavit of the party under Rule 56(f) in excuse thereof.

In Rule 56(f) the defendant was provided with a method to protect it for not complying with Rule 56(e) by it asserting in affidavit form that it is not able to procure competent evidence in the form of affidavit, deposition, admissions and as provided by Rule 56, to support the defendant in opposition to the motion for summary judgment upon hearing or on its objections thereto. The Court concludes that the defendant has not properly availed itself of this method in that defendant has not made a good faith earnest effort to present competent evidence of facts, depositions and exhibits in its possession or available to it by appropriate procedure and discovery action or reasonable investigation, since the filing of this action on October 4, 1954. The Court refers to the italicized portion of the defendant's attorney's first affidavit set forth in this opinion, which I emphasize by repeating again:

*"Based upon an examination of the files, containing protests and briefs filed by plaintiff's representatives, reports of Internal Revenue Agents, and other data, and not upon mere suspicion or surmise, affiant believes that the following facts, among others, which cannot now be shown by affidavits, can be shown at the trial."*

and also refers to the italicized portion of the defendant's attorney's second affidavit set forth in this opinion which I emphasize by repeating again:

*"Based upon additional information \* \* \* depositions of Sarkes Tarzian, Donald Duck, Charles Clapham, and Robert L. Floyd taken at*

*Indianapolis, Indiana, on April 19 and 20, 1956,"*

It appears to the Court from the defendant's own affidavits that the defendant could have produced and shown competent evidence under Rule 56 and particularly Rule 56(e) and (f), but the defendant's attorney attempted to summarize this material with conclusions, opinions and no facts which, if the Court accepted under Rule 56(f), would simply be a circumvention of the intent of Rule 56(f) which I construe to mean a method excusing the defendant from providing competent evidence under Rule 56(e) on or before the hearing date of the motion for summary judgment.

Defendant through its brief and its attorney's affidavits leans heavily upon the defendant's right and need for cross-examination of plaintiff's witnesses upon trial and the credibility tests of witnesses of plaintiff upon trial, to develop its evidence to defeat plaintiff's complaint under the issues of the case. The Court agrees that upon a proper showing by the defendant in this motion for summary judgment proceedings, that this claim would warrant the Court in denying the motion for summary judgment. I conclude, however, that defendant in this case must in addition recite clear and convincing reasons based upon fact or in explanation for the absence of such facts, before the Court would entertain the cross-examination and credibility reasons. If the Court should recognize the cross-examination and credibility reasons without additional explanation and facts, then it would be possible for the defendant to defeat a prima facie showing for summary judgment by the plaintiff under Rule 56, upon the conjecture and the hope of favorable surprise of the acquisition of unknown evidence to be procured by the defendant from the cross-examination of the plaintiff's witnesses upon a trial and upon the test of the credibility of plaintiff's witnesses. This case has been pending since October 4, 1954, with no record of discovery proceedings on the part of the defendant, except as referred to above,

and furthermore, it appears from the affidavits of defendant's attorney that it is possessed of facts, but has not in good faith complied with Rule 56(e) and (f) in the use thereof. The whole theory and purpose of the summary judgment Rule 56, would be defeated in this case if plaintiff could be forced to trial by the asserted reasons unsupported factually in defendant's affidavits and by defendant merely contending that it denies the facts submitted under oath by the plaintiff and that it can prove this denial by cross-examination of the plaintiff's witnesses upon trial and that it could successfully attack the credibility of plaintiff's witnesses upon trial, without giving any reason supported factually under Rule 56(f) for its utter reliance upon the negative denial and credibility and cross-examination reasons.

In order for plaintiff's motion to prevail, there shall first appear competent evidence as required by Rule 56(c), from the pleadings and admissions on file, and from the affidavits, that there is no genuine issue as to any material fact.

The plaintiff chose under Rule 56(a) and (e) in view of the pleadings, to support its motion for summary judgment with affidavit of its President, and affidavits of its Accountant, Controller and Assistant Treasurer together with exhibits of records of the plaintiff.

The defendant, faced with the pleadings, motion and supporting affidavits, failed to submit competent evidence authorized by Rule 56(c) and (e). Consequently, there is no enlightenment affirmatively by opposing competent evidence in behalf of the defendant, of a genuine issue as to any material fact. The defendant cannot rely upon the pleadings alone in this case unsupported by competent evidence to defeat consideration of the motion for summary judgment. This case is distinguished from Campana Corporation v. Harrison, 7 Cir., 1943, 135 F.2d 334, in which there was not only an issue of fact pointed up by the pleadings, but the opposing parties also filed opposing qualified affidavits

# 869

of facts supporting the pleaded issue of fact in their respective pleadings.

The whole theory and purpose of the summary judgment proceedings under Rule 56 would be defeated in this case, if it could be forced to trial by defendant merely contending that a factual issue exists by the pleadings without any showing of competent evidence as provided by said Rule 56 where one of the parties has tendered such competent evidence.

█ Defendant was not obligated to make such a showing against plaintiff's motion for summary judgment that it would prevail upon trial, but in the face of a prima facie showing by the plaintiff, the defendant was required to show by competent evidence that there is a genuine issue of any material fact.

██ The burden is upon the plaintiff as the moving party to demonstrate clearly that there is no genuine issue as to any material fact, and the Court will resolve any doubts against it, construing the evidence liberally in favor of the defendant. The affidavits of the plaintiff are only used to determine whether a genuine issue as to any material fact exists under the pleadings but not as a basis to decide between facts if contrary facts should be in the same affidavit or opposing affidavit of which there is none in this record. The Court is not required to hold the uncontradicted affidavits of plaintiff as accurate or the truth, but may accept as accurate and true, all or any part thereof as believed by the Court and such as was presented properly in accordance with Rule 56.

In considering the evidence in support of and in opposition to the motion for summary judgment, the Court has disregarded recitations and other data that is not competent under Rule 56.

Based upon the competent evidence from admissions of fact in the pleadings, admissions, and the affidavits, I find no genuine issue as to any material fact and that the plaintiff is entitled to judgment as a matter of law.

Certain of the specific facts presented in this case in aid of certain questions raised by the plaintiff and defendant, are as follows:

Sarkes Tarzian and his wife Mary were partners under the name and style of "Sarkes Tarzian" commencing primarily an engineering consultant business, in the year 1945. During the years following they experimented with and developed devices for use in conjunction with radio and television receiving sets, one of which was an automatic television tuning mechanism, hereinafter called a "tuner." They either filed or came into possession as owners of two applications for letters patent pursuant to the laws of the United States for the "tuner." They offered manufacturing rights to the "tuner" to anyone upon agreement to pay a reasonable license fee. They also commenced manufacture of the "tuners" in quantity when they found that manufacturers in the industry preferred to buy, rather than become licensees, and by the year 1948 their business became substantial. The purpose of the business shifted from that of 1948 to manufacturing in the year 1949, which required large inventories among other things and a change in accounting method from cash to accrual basis for income tax purposes under the Internal Revenue Code of 1939, as amended. In the year 1949, they faced large tax payments to the United States of America and most of their cash from earned income was invested in the business and there was a need for liquid cash to meet these tax payments.

The "tuner" manufacturing business in the year 1949, was still on the increase and expanded bank credit was necessary to continue the increase in manufacturing. They concluded that it was necessary to isolate the profitable business of manufacturing the "tuner" from the partnership and its other less profitable activities, which were considered financially hazardous.

On September 1, 1949, the Sarkes Tarzian, Inc. was duly organized and qualified to do business in the State of Indiana with Sarkes Tarzian, Mary Tarzian

and Veraje Tarzian as organizers, incorporators and directors. Sarkes Tarzian and Mary Tarzian became the only stock holders and President and Secretary-Treasurer respectively.

The Corporation at its first meeting of the Board of Directors on September 1, 1949, duly approved and directed its officers to enter into the following written contracts with the partnership on behalf of the Corporation and that in each instance the contract was duly consummated on the same date:

(a) Contract for sale of partnership property to Corporation in exchange for certificates of stock;

(b) Contract for the sale of two applications for letters patent for a cash consideration payable in installments;

(c) A loan from the Tarzians to the plaintiff;

(d) A lease for real estate of the Tarzians to the plaintiff;

(e) Contract for the sale of inventory of the partnership to the plaintiff.

The contents of said contracts are narrated as follows:

(a) The first contract conveyed all the assets of every nature and description of the partnership to the plaintiff, which was used by the partnership in the manufacturing business at the Bloomington, Indiana, factory, including all contracts, excepting cash on hand or on deposit, all real estate and interest in real estate, all automobiles and other motor driven vehicles, *All Patents, Patent Applications and Inventions Covered Thereby and Rights Thereunder,* all inventory of raw materials and parts, except such as was then in process of manufacture, excluding all accounts receivable and loans receivable, corporate stocks and bonds, good will, books of entry and account and partnership business records. It also provided that the transfer was to be absolute and forever, free and clear from all liens and incumbrances, all bills and accounts payable and all Federal Income Tax liabilities, Indiana Gross Income Tax liabilities and all the liabilities incurred prior to the date of the contract, except the liability and obligation of the plaintiff to perform on all contracts transferred from the partnership to it, and the plaintiff assumed all liabilities under said contracts transferred to it by this arrangement. It was further agreed that the plaintiff could have access to and use of the books of entry and account and partnership business records relating to the assets transferred by this contract, to the extent that it may be necessary for it to perform and receive performance pursuant to the contract transferred by this arrangement and its obligations under this contract. *The plaintiff further agreed in said contract to issue to each of the partners, Sarkes Tarzian and Mary Tarzian, in the ratio of two to one respectively, so many of the authorized and unissued shares of the common stock of the plaintiff as shall be required in order to give to each share of the common stock of plaintiff issued and outstanding, a value of $20.00 per share, based upon the book value of the net assets of second party on the date of this contract.*

Following the execution of this contract the said partners on September 1, 1949, in writing executed its bill of sale transferring the title of said property to the plaintiff and received the plaintiff's certificate of stock in accordance with the terms of the contract.

The physical plant, work in process, machinery and back log of orders for the manufacturing of "tuners" by the partners and transferred to the plaintiff pursuant to this contract was done so, at the book value.

(b) The second contract conveyed the entire right, title and interest of the said partnership in two applications, for letters patent, of the United States, Serial Nos. 772773 and 16771 and the inventions covered thereby and the letters patent that may be granted thereon in the United States, or any Division renewal or reissue of said applications, to the plaintiff. It further provided that for and during the period of twenty years from the date of the contract that the plaintiff would pay the partnership as

installments on the purchase price made, a sum equal to 2½% of the plaintiff's selling price or the sum of 30 cents, whichever sum is greater, for each and every "tuner" covered by the said patent applications sold or otherwise disposed of for a consideration by the plaintiff, and a sum equal to 2% of the selling price of any licensee of the plaintiff or the sum of 10 cents, whichever sum is greater for each and every one of said "tuners" sold or otherwise disposed of for a consideration by any licensee of the plaintiff. Said contract further provided that the said "tuners" sold by the plaintiff or its licensees shall be subject to payment by the plaintiff of the installment payments of the purchase price above referred to only on account of the first sale thereof or could dispose for a consideration; however, credit risks of the purchasers of the plaintiff and its licensees were not to be assumed by the partnership and the partners were entitled to the installment payments of the purchase price regardless of the payment by customers of the plaintiff or its licensees. Said contract further provided that within 60 days following the close of each calendar quarter the plaintiff shall furnish the partners a report of the sales of the "tuners" within the last complete quarter and therewith shall make payment to the partners of all sums owing as installments on the purchase price for these applications of letters patent. The plaintiff further agreed to make available to the partners at reasonable times for inspection and audit, all accounts and records of the plaintiff relating to the sale of the said "tuners" by the plaintiff or its licensees. The plaintiff further agreed to protect the validity of said applications for letters patent, renewal or a reissue thereof, and the letters patent that may be granted, and to pay for all regular and other expenses to save the integrity of said applications and resulting letters patent. The plaintiff further agreed to cause notice of patent application for patent notice required by law to be placed on all units of the "tuners." Plaintiff further

agrees that any licensing agreement entered into by it will be in writing and a fully executed copy thereof would be delivered to the partners. Plaintiff further agreed that any such licensing agreement with respect to the manufacturing, use or sale by the licensee of the said "tuners" shall provide for the payment by its licensee to the plaintiff of a consideration of not less than 2% of the selling price of the licensee, or the sum of 10 cents whichever sum is greater, for each and every one of the said "tuners" sold or otherwise disposed of for a consideration by the licensee. Said contract further provided that such licensing agreements shall expressly provide that the licensee shall furnish to the plaintiff within 60 days following the close of each calendar quarter, a report and payment on "tuners" manufactured and sold for a consideration. It was also agreed that said licensing agreement shall also provide that the plaintiff at reasonable times may inspect and audit the records of the licensee relating to the sale of said "tuners." It also further agreed that the licensing agreements shall expressly provide that the licensee shall cause a notice of the patent application and patent notice required by law on all units of "tuners."

The partners on September 1, 1949, did execute in writing their two "patent deeds before issue" for the said applications for letters patent of the United States, to the plaintiff which was recorded in the United States Patent Office on November 25, 1949, and recorded in volume F 222 at pages 154, 155, 159 and 160.

The consideration stated in the foregoing contract for the sale of the applications for letters patent by the partners to the plaintiff and patent deeds were based on the same price per unit as the partners had been receiving under a licensing agreement with Magnavox Corporation prior to the date of incorporation of the plaintiff and of this contract. Following the plaintiff's incorporation, the Magnavox Corporation relinquished its license with the partnership and en-

tered into a written contract with the plaintiff to purchase manufactured "tuners" from the plaintiff.

(c) The third contract was for a loan from Sarkes and Mary Tarzian in the sum of $60,000 to be secured by promissory notes of the plaintiff payable on demand and without interest to maturity but with interest at the rate of 6% after maturity, until paid, with attorneys fees. That pursuant to said authorization, the plaintiff did obtain said funds from said parties and executed said promissory notes.

(d) The fourth contract was for a lease to the plaintiff from Sarkes and Mary Tarzian for a term of five years from September 1, 1949, certain real estate, including a rental to be paid for and during the first 30 months of said term of $300 per month and for the second 30 months of said term of $400 per month. That the plaintiff did through its officers enter into said written lease.

(e) The fifth contract was for the sale of inventory on hand from the partnership to the plaintiff at cost.

During the taxable year ending June 30, 1950, of the plaintiff, all the above transactions were consummated, and consideration paid as agreed, the assets of the partnership were exchanged for stock in the Corporation and no other assets were contributed therefor. The transactions recited above pertaining to the sale of the applications for the letters patent were fully consummated during the said year. The plaintiff went into production of the "tuners" and in the ten months of operation, had a net income in excess of $2,000,000 during which time it repaid the loan of $60,000 in full to the partners, paid the partnership the sum of $96,722.96 for the inventory and in addition thereto paid to the partners the sum of $156,819.96 during the said year as the installment payment for "tuners" followed under the said contract of sale of the applications for letters patent.

During the year ending June 30, 1950, the United States Letter Patent No. 2497747 was issued on application number 16771 on February 14, 1950. No patent was issued on the application for letters patent serial number 772773 as the patentable features contained therein were considered to be covered by the application number 16771. The only "tuners" manufactured by the plaintiff during this year ending June 30, 1950, were under these applications and the resulting patent.

The said patent sales contract remained unchanged during the taxable year ending June 30, 1950, but thereafter on January 15, 1951, the contract was revised in writing to provide that the Corporation would become the owner of the patents upon payment of $750,000 in addition to all amounts previously paid in installments under the contract of September 1, 1949, to the date of January 15, 1951, in the sum of $275,085.92.

Defendant contends that the patent applications and invention were merely contributions to capital and were acquired by plaintiff solely in exchange for its capital stock. Defendant then further contends that pursuant to the express provisions of Section 112(b) (5), and 113(a) of the Internal Revenue Code of 1939, as amended, 26 U.S.C.A. §§ 112(b) (5), 113(a), that no deduction is allowable to plaintiff.

The plaintiff contends that the foregoing facts support the Court's finding that the patent applications were acquired by plaintiff as a purchaser for a price payable in installments in a sale transaction and not in exchange for corporation stock or in any manner a contribution to capital of plaintiff and entitles the plaintiff to a basis for tax purposes equal to the entire purchase price pursuant to Section 113(a) of the Internal Revenue Code of 1939, as amended.

Defendant seeks to impress upon the Court the following conclusions and opinions:

It terms the transaction involving the applications for letters patent as simply a transfer of property from one of Sarkes Tarzian's pockets to the other; that the symbols and labels of

the transaction are not controlling; that whatever other motives the partners may have had for transferring the manufacturing business to plaintiff, the decision to give the appearance of separate transactions by the five contracts was essentially one transaction and made with tax avoidance as the dominant motive; that no legitimate business motive existed for the five separate transactions, when it is obvious that plaintiff could not have begun to operate and would have been less than a shell of a manufacturing business without the applications for the patent as well as the other contracts; that the only purpose in disguising the five transfers in separate transactions was to allow the Tarzians to remove a substantial part of the profits of the plaintiff through the consideration payments of the separate contracts from taxation at ordinary income tax rates; that by giving the contract for the applications for patent the surface resemblance of a sale, the Tarzians had the ground work laid for the claim that the installment payments and price received under the contract constituted long-term capital gain taxable at lower rates and also laid the ground work for the claim by the plaintiff, which the partners owned, to a deduction for depreciation based upon an artificially stepped-up basis; that neither the agreement of September 1, 1949, and/or January 15, 1951, pertaining to the "tuner" patent were carried out according to their terms which demonstrates and is evidence warranting the conclusion that the contracts were not intended to have any real effect except for income tax purposes. The defendant cites the authorities of United States v. Cumberland Publishing Service Co., 338 U.S. 451, 455, 70 S.Ct. 280, 94 L.Ed. 251, for the rule that the existence of a strong tax avoidance motive is relevant to the determination of the substance of what was done. Defendant further cites the authorities of Higgens v. Smith, 308 U.S. 473, 477, 478, 60 S.Ct. 355, 84 L.Ed. 406; Labrot v. Burnet, 61 App.D.C. 47, 57 F.2d 413; Snowden v. McCabe, 6 Cir., 111 F.2d 743; 1432 Broadway Corp. v. Commissioner, 2 Cir., 160 F.2d 885, for the rule that the transaction must be determined from the circumstances in terms of what the parties actually accomplished and what they intended to accomplish and is not hinged upon symbols and labels employed by the parties or the form in which they chose to case the transaction.

The authorities above cited by the defendant support the rules of law presented by defendant and which rules this Court considered, followed and agrees in reaching the conclusion set forth in this opinion. The defendant's authorities applied the combination of rules observed to the particular combination of facts referred to by the authority, which facts agree in part, but do not coincide with uncontroverted facts within the issues of this case and upon which they are based.

The conclusions and opinions of facts and rules of law urged by the defendant brings into focus an appropriate quotation from the case of Sun Properties, Inc., v. United States, 5 Cir., 220 F.2d 171, 173:

"This rationale is perilously plausible. It is in effect saying to the taxpayer, 'you did this under suspicious circumstances; therefore, you did not do it at all, and you are not entitled to any tax advantages.' For all of the circumstances relied upon by the Government are consistent both logically and empirically, we think, with the opposite conclusion that the transaction was a sale in fact as well as in form; these are good reasons to scrutinize the transaction carefully, but they are not rational proof that it was something other than what it purported to be."

The defendant here, in effect, is saying there was no dominant utility or need for the plaintiff as the partners owned the stock and the patent applications, and the same business success would have been enjoyed during the tax year by the partnership and therefore the purpose in organizing plaintiff was tax avoidance only. Therefore the corporation transactions of 1949, with the partnership

874

will be disregarded not as to your rate of income tax, your income and profit and other dealings, but as to the contract of sale of the patent applications which defendant regards as an exchange for stock and a contribution to capital.

 Congress when it enacted the Internal Revenue Code of 1939, and amendment thereto applicable to this case, was dealing with a most practicable problem, the problem of taxation. In construing such, this Court should also be practical and not ignore the ordinary everyday commercial experiences which constitute its background. Tyler v. United States, 281 U.S. 497, 50 S.Ct. 356, 74 L.Ed. 991, 69 A.L.R. 758. Corporations are recognized in the tax system and by interpretation even though wholly controlled by a single stock holder. The utility of a corporation, even with a single stock holder, with its continuity, longevity and other virtues is recognized in our Industrial System as one of common knowledge for the development of large scale management and production. The decision, method, judgment and business purpose of the plaintiff under the law must be left to the taxpayer to determine whether a corporate structure such as plaintiff should be utilized. The facts known to the plaintiff and its stock holders on September 1, 1949, and not what developed thereafter, is determinative of the transaction for the tax return for the year ending June 30, 1950. It is recognized, however, that subsequent facts could be evidentiary of what the transaction was on September 1, 1949.

The entire transaction seems to be constructed around the successful development of a new idea, or an invention possessed by a family as a part of the development of the television industry, yet in its infancy. While the partnership was sure of the usefulness of the "tuner" yet it could not be sure of the monopoly because on September 1, 1949, there was pending the two applications for letters patent and no patent was issued or denied until February 14, 1950. Prior to the Corporation, the "tuner" idea had been an expanding development for several years not only in experimentation, but in production, sales, management and financing.

 This Court believes from the uncontradicted competent evidence that the dominant purpose of the plaintiff and its stock holders was for sound business purposes and there resulted other benefits and disabilities including but not limited to the tax consequences to the plaintiff and its stock holders. It would be hindsight of the most speculative kind to be in the position of the Government on June 30, 1950, or thereafter, and assert that plaintiff's and its stock holders' dominant purpose was tax avoidance. The foresight of the plaintiff and its stock holders based on their speculative judgment, ingenuity and application of sound management principles, produced a monopoly by means of a patent, the manufacture of the product thereof resulting in a net income in excess of $2,000,000 which also meant a new substantial taxpayer to defendant who paid taxes of over $800,000. It is true that the partners on June 30, 1950, did save taxes by the transaction if the speculation is permitted to be advanced to say that the partnership could have produced income as was produced by the Corporation in the absence of the Corporation plaintiff. It is not in itself a violation of the Internal Revenue Code of 1939, as amended, and in force during the tax years in question, for the plaintiff to plan its business to minimize its taxes. There is also ample authority that plaintiff could acquire its capital assets by the sale of stock and by purchase at the time of incorporation from its controlling stock holders and such be recognized for the purpose of depreciation under the Internal Revenue Code of 1939, as amended, and in effect during the tax year in question. Sun Properties, Inc. v. United States, 5 Cir., 1955, 220 F.2d 171; Herff & Dittmar Land Co., 1935, 32 B.T.A. 349, Acq. Vol. XIV—2 Cum.Bul. p. 10; Hollywood, Inc., 1948, 10 T.C. 175, Acq. 48—1 Cum.Bul. p. 2; Rowan v. United States, 5 Cir., 1955, 219 F.2d 51.

When plaintiff was organized the corporate rates of tax, under the Internal Revenue Code of 1939, as amended, had been raised substantially in excess of capital gains rates. The partners could obtain a stepped-up basis on property sold to plaintiff for purposes of depreciation against a 52% tax rate or even a 90% excess profits tax rate at a cost to the partners of only the 25% capital gains tax rate on the gain on the sale of the property to plaintiff. Any person organizing a corporation for a business purpose is permitted to scrutinize the Internal Revenue Code and make arrangements to minimize his tax obligations so long as the purpose for business exists and the matter of tax avoidance does not control the transaction. When the partners sold the patent applications to the plaintiff, the following tax consequences ensued:

(1) The partners realized a gain upon the sale which was taxable to capital gains rates and since they were on the cash basis and the purchase price was payable on installments, the tax was payable in the year the installments were received.

(2) The plaintiff took as its basis for depreciation and subsequent disposition, the purchase price of the application for patent and the resulting patent.

The Commissioner of Internal Revenue requested remedial legislation of the United States Congress and pursuant to such request Section 328 of the Revenue Act of 1951, 26 U.S.C.A. § 117(*o*) and note, was enacted taxing the gain to the selling stock holders at ordinary income tax rates with the express provision that the Act was not to apply to transactions entered into before May 3, 1951. The report of the House Ways and Means Committee of the United States Congress explained the purpose of this legislation as follows:

" * * * this bill is intended to forestall the practice of selling depreciable assets to controlled corporations in order to obtain the substantial tax benefit available *under existing law* * * *

will apply only to sales or exchanges made after May 3, 1951, * * *."

The plaintiff asserted that the Commissioner having failed in the Courts to attack the type of transaction involved in this law suit went to the United States Congress and obtained remedial legislation which, of course, was only effective after May 3, 1951.

This legislation did not affect the transaction involved in this suit which was for the ten months period prior to June 30, 1950. The conduct of the defendant through its Commissioner of Internal Revenue and a declaration of the United States Congress in passing this remedial legislation, is indicative of what interpretation is placed upon the Internal Revenue Code of 1939, as amended, insofar as it affected the plaintiff and the issues involved in this law suit during the ten months ending June 30, 1950.

The final issue in this case pertains to depreciation deduction. Is depreciation deduction allowable under the Internal Revenue Code of 1939, as amended, on the applications for patent? Is depreciation deduction allowable under the Internal Revenue Code of 1939, as amended, on the patent issued February 14, 1950?

The plaintiff's brief in support of its motion for summary judgment stated the following:

"No patent was issued under application number 772773 and no depreciation was claimed on that application."

The evidence in support of the motion for summary judgment disclosed that no depreciation was taken by the plaintiff on the application for patent number 772773. The defendant does not contest this assertion of the plaintiff in its brief. The Court has found that no question of depreciation deduction exists on the application number 772773.

 The plaintiff possessed a property right with its ownership of the application for patent number 16771 for the period commencing September 1, 1949, continuously to February 14, 1950. Commissioner of Internal Revenue v. Ste-

phens-Adamson Mfg. Co., 7 Cir., 51 F.2d 681. The application for patent although property under the Revenue Act is not subject to depreciation thereunder as it is an inchoate right which matures into a depreciable asset beginning with the date the patent was issued. Hershey Manufacturing Co. v. Commissioner, 1928, 14 B.T.A. 867, affirmed 10 Cir., 1930, 43 F.2d 298.

 The patent numbered 2497747 emanating from the application number 16771 on February 14, 1950, is subject to depreciation from said date for the life of the patent in the full amount of the installment cost payments for the period February 14, 1950, to and including June 30, 1950, because it was a cost pertaining to that year alone and measured by income over that period and deduction for this depreciation is allowable under the Revenue Act. Associated Patentees, Inc., 4 T.C. 979). Opinion on rehearing 1945; published by the Commissioner of Internal Revenue–1–C.B. 1); Hershey Manufacturing Co. v. Commissioner, 1928, 14 B.T.A. 867, affirmed 10 Cir., 1930, 43 F.2d 298; Commissioner of Internal Revenue v. Stephens-Adamson Mfg. Co., 7 Cir., 1931, 51 F.2d 681.

The hearing in this matter having been completed on May 2, 1956, pursuant to an order of April 2, 1956, the Court therefore grants plaintiff's motion for summary judgment and enters judgment for plaintiff in the amount of $36,097.42 plus interest at the rate of 6% on the amount of $25,630.20 from the date of payment on February 10, 1955, to date of payment by defendant and interest at the rate of 6% on the amount of $125.33 from the date of payment on May 21, 1952, to date of payment by defendant and interest at the rate of 6% per annum on the amount of $10,341.89 from the date of payment on May 5, 1952, to date of payment by defendant, said principal amount being the amount of Federal tax and deficiency interest paid as the result of the disallowance by defendant of patent amortization claimed by the plaintiff on its Federal Income Tax Return for the taxable year ended June 30, 1950, and applicable to the period from February 14, 1950, to June 30, 1950, which patent amortization the Court now finds plaintiff is entitled to deduct for that period. Plaintiff is denied the amortization deduction which it claimed on its Federal Income Tax Return for the period from September 1, 1949, to February 13, 1950.