**SARKES TARZIAN, Inc., Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**No. IP 54–C–11.**

United States District Court
S. D. Indiana,
Indianapolis Division.

Feb. 6, 1958.

Dutton & Kappes, C. B. Dutton, Ross, McCord, Ice & Miller, Wesley A. Dierberger and Merle H. Miller, Indianapolis, Ind., for plaintiff.

Don A. Tabbert, U. S. Atty., Indianapolis, Ind., Charles K. Rice, Asst. Atty. Gen., Harlan Pomeroy, and James P. Garland, Attys., Dept. of Justice, Washington, D. C., for defendant.

HOLDER, District Judge.

The action was commenced in this court on October 4, 1954. A summary judgment was granted the plaintiff May 3, 1956. Sarkes Tarzian, Inc., v. United States of America, D.C., 140 F.Supp. 863. It was reversed on appeal for the reason that there was a fact question not determinable in summary judgment proceedings. Sarkes Tarzian, Inc., v. United States of America, 7 Cir., 240 F.2d 467.

The trial was concluded, except for post trial briefing and final argument, on June 28, 1957. The plaintiff, after post trial briefing, on January 15, 1958, by its written motion requested leave of the court to reopen the case to offer additional evidence which was granted. The additional evidence and final arguments were heard and trial was concluded on January 22, 1958.

The issues are presented by plaintiff's amended complaint and defendant's answer of two defenses.[1]

1. Plaintiff by its complaint and defendant by its first defense assert:

a. That plaintiff is a duly organized and existing corporation under the laws of the State of Indiana with its principal place of business in Bloomington, Indiana; which is denied by defendant.

b. That the action arises under Section 7422 of the Internal Revenue Code of 1954, 26 U.S.C.A. § 7422 and that jurisdiction of the Court is conferred by the Act of June 25, 1948, C. 646, 62 Stat. 933, as amended, being Title 28 U.S.C.A. § 1346; which is admitted by defendant.

c. That plaintiff filed its Federal tax return for its taxable year ended June 30, 1950, on November 12, 1950, with the Director of Internal Revenue of the District of Indiana at Indianapolis, Indiana, and plaintiff has been assessed by and has paid to the Treasury Department of the United States the sum of $843,467.01 as its income tax for said taxable year. On November 10, 1953, and again on April 21, 1954, a form granting an extension of time for the assessment of tax was signed by the plaintiff at the request of the Director of Internal Revenue, and these forms were filed with the Director of Internal Revenue at Indianapolis, Indiana. The payments of the said tax liability for the taxable year ended June 30, 1950, were made as follows: September 14, 1950, $95,000; November 14, 1950, $99,519.88; December 21, 1950, $193,612.08; March 26, 1951, $193,612.08; June 18, 1951, $193,612.07; May 5, 1952, $42,355.37; May 21, 1952, $125.33; and February 10, 1955, $25,630.20. All of which is admitted by defendant.

d. That on March 22, 1954 it filed a written Claim for Refund on Form 843 with the Director of Internal Revenue for the District of Indiana at Indianapolis, Indiana, claiming a refund in the amount of $44,425.02, plus interest as provided by law for the taxable year ended June 30, 1950, which is admitted by defendant, but it denies that the claim was properly executed.

e. That defendant has not acted upon said claim for refund and that more than six months elapsed since the filing thereof, which is admitted by defendant.

f. That thereafter the Internal Revenue Service by means of a jeopardy assessment, assessed an additional amount against the plaintiff of $20,347.89 for the taxable year ended June 30, 1950, plus interest of $5,282.31, or a total amount of $25,630.20 which was paid as above recited.

g. That on June 2, 1955 it filed a written Claim for Refund on Form 843 with the Director of Internal Revenue for the District of Indiana, Indianapolis, Indiana, claiming a refund in the amount of $25,630.20 for the taxable year ended June 30, 1950, plus interest as provided by law, which the defendant admits but denies the claim was properly executed.

h. That on June 23, 1955, plaintiff was notified that said claim for refund for $25,630.20 was disallowed by the Director of Internal Revenue for the District of Indiana, which is admitted by defendant.

Disposition of the defendant's second defense will first be undertaken since there is no conflict in the evidence that the application for patent serial No. 772773 ever culminated in the issuance of a patent. And there is no conflict in the evidence that the application for patent serial No. 16771 which was transferred

i. That on or about September 1, 1949, plaintiff acquired from Sarkes and Mary Tarzian, partners, applications for Letters Patent of the United States bearing serial No. 772773 and serial No. 16771, the inventions covered thereby and the letters patent that may be granted thereon in the United States, or any division, renewal, or reissue of said applications. The application No. 772773 covered the invention of a high frequency manual selection device for television receiving sets, and the other application covered the invention of automatic television tuners for television receiving sets. All of which is admitted by defendant.

That it acquired said applications by purchase, which the defendant denies.

j. That in its contract of purchase plaintiff agreed to pay a reasonable purchase price for the said applications in installments, extending over a period of twenty (20) years, and in an amount based upon the plaintiff's selling price for each frequency manual selecting device and each automatic television tuner sold, which defendant denies.

k. In the taxable year ended June 30, 1950, plaintiff paid vendor of the said applications the sum of $156,819.96 under said purchase contract which defendant denies.

That it deducted such sum in its Federal tax return for such taxable year, on the basis that its total cost in purchasing the applications could not be determined at the end of the taxable year, which the defendant admits.

That since the cost payments made on the purchase price in the taxable year were attributable to units produced in that year, no distortion of income resulted, which defendant denied.

l. An agent of the Internal Revenue Service disallowed the sum $107,772.86 of the $156,819.96 deduction taken by plaintiff in its return for the year ended June 30, 1950, he allowed a deduction of $49,047.10 and also allowed additional depreciation on other items in said return of $5,446.45 making a net disallowance of $102,326.41, which defendant admits.

That the deficiency tax on said disallowance of $102,326.41 plus interest thereon was $42,335.37 which defendant denies but admits it was $42,335.04. In addition to this alleged overpayment plaintiff claims an overpayment of tax in the amount of $2,069.65, resulting from the additional deductions for depreciation allowed by the Internal Revenue Service over amounts claimed on its said Federal tax return, which is denied by defendant. The defendant admits plaintiff has claimed a refund of $44,425.02.

m. In a subsequent examination the agent of the Internal Revenue Service disallowed the amount of $49,047.10, which he had previously allowed, which disallowance resulted in the additional assessment of tax and interest in the amount of $25,630.20 which was paid by plaintiff and a written claim for refund filed as recited above. That the total refunds claimed by plaintiff is $70,055.22. All of which is admitted by defendant.

Plaintiff says that such tax was erroneously and illegally collected from it by defendant, which is denied by defendant.

Defendant affirmatively asserts that the patent applications transfer by the partners of the plaintiff corporation was solely in exchange for its capital stock. That they were in control of plaintiff after the exchange and the stock of the parties was substantially in proportion to their interest in the patent applications prior to the exchange within the provisions of Sec. 112(b) (5) of the Internal Revenue Code of 1939, as amended, 26 U.S.C.A. § 112(b) (5). That the basis to the plaintiff of the patent applications was the same as it would have been in the hands of the partners pursuant, to provisions of Sec. 113(a) (8) of the Internal Revenue Code of 1939, as amended, 26 U.S.C.A. § 113(a) (8). That the basis of the patent applications in the hands of the partners was zero and consequently the plaintiff's basis was zero. That no deduction for depreciation is allowable to plaintiff for the property having a zero basis.

n. That the correct Federal tax liability of the plaintiff for the taxable year ended June 30, 1950, $773,441.79 and that it has paid $843,467.01 to defendant which is $70,055.22 more than is legally owing by plaintiff to defendant, which is denied by defendant but it admits plaintiff has paid $843,467.01 taxes for said tax year. Plaintiff asks judgment for $70,055.22 plus interest at 6% per annum and costs.

to the plaintiff September 1, 1949, resulted in a patent to plaintiff which was its property from February 14, 1950 to June 30, 1950, the end of plantiff's tax year.

■■ The plaintiff possessed a property right with its ownership of the applications for patents. Commissioner of Internal Revenue v. Stephens-Adamson Mfg. Co., 7 Cir., 1931, 51 F.2d 681. The applications for the patents, although property under the Revenue Act, are not subject to depreciation thereunder as they are inchoate rights which mature into a depreciable asset beginning with the date a patent issues therefrom. Hershey Manufacturing Co. v. Commissioner, 1928, 14 B.T.A. 867, affirmed 10 Cir., 1930, 43 F.2d 298. Plaintiff's claim for refund based on its claim of deduction for depreciation in respect to patent applications serial Nos. 772773 and 16771 is therefore denied.

The patent number 2497747 emanating from the application number 16771 on February 14, 1950, is subject to depreciation from such date for the life of the patent in the full amount of the installment cost payments for the period February 14, 1950, to and including June 30, 1950, because it was a cost pertaining to that year above and measured by income over that period and deduction for this depreciation is allowable under the Revenue Act. Associated Patentees, Inc., 4 T.C. 979. Opinion on rehearing 1945 published by the Commissioner of Internal Revenue—1–C.B. 1; Hershey Manufacturing Co. v. Commissioner, 1928, 14 B.T.A. 867, affirmed 10 Cir., 1930, 43 F. 2d 298; Commissioner of Internal Revenue v. Stephens-Adamson Mfg. Co., 7 Cir., 1931, 51 F.2d 681. The defendant's second defense as to the patent is therefore denied.

The plaintiff has abandoned the sum of $2,069.65 of its claim for refund of March 22, 1954, so that its total claims for refund on trial now total $68,345.22, plus 6% interest per annum. With the claim for refund pertaining to the applications for the patents having been disposed of, plaintiff's claim for refund is reduced to $36,097.42, plus interest at the rate of 6% per annum on the amount of $25,630.20 from the date of plaintiff's payment on February 10, 1955, to date of refund by defendant; and plus interest at the rate of 6% per annum on the amount of $125.33 from the date of plaintiff's payment on May 21, 1952, to date of refund by defendant; and plus interest at the rate of 6% per annum on the amount of $10,341.89 from the date of plaintiff's payment on May 5, 1952, to date of refund by defendant. The principal amount of $36,097.42 is the amount of Federal tax and deficiency interest paid by plaintiff as the result of the disallowance by defendant of patent amortization claimed by the plaintiff on its Federal income tax return for the taxable year ended June 30, 1950, and applicable to the period from February 14, 1950, the date of the patent's issuance, to June 30, 1950.

Before discussing the remaining controversy, it would be informative to state the general background of the law at the times in issue confronting the public, including the plaintiff and the Commissioner of Internal Revenue. When plaintiff was organized in the year 1949 the corporate rates of tax, under the Internal Revenue Code of 1939, as amended, had been raised substantially in excess of capital gains rates. Any small group of persons organizing a corporation could obtain a stepped-up basis on property sold to the corporation for the purpose of depreciation against a 52% tax rate or even a 90% excess profits tax rate at a cost to the stockholder sellers of only the 25% capital gains tax rate on the gain on

By way of a second defense the defendant asserts:

o. That no patent was issued in respect to patent application serial No. 772773 during the taxable year ended June 30, 1950, or at any other time.

That a patent was not issued in respect to patent application serial No. 16771 until February 14, 1950.

p. That no deduction for depreciation is allowable in respect to patent applications.

the sale of the property to a corporation. The Commissioner of Internal Revenue requested remedial legislation of the United States Congress and pursuant to such request Section 328 of the Revenue Act of 1951, 26 U.S.C.A. § 117(o) and note, was enacted taxing the gain to the selling stockholders at the ordinary income tax rates with the express provision that the Act was not to apply to transactions entered into before May, 3, 1951. The report of the House Ways and Means Committee of the United States Congress explained the purpose of this legislation.[2]

The conduct of the defendant, through its Commissioner of Internal Revenue, and the declaration of the United States Congress in passing the remedial legislation, is indicative of the interpretation to be placed upon the Internal Revenue Code of 1939, as amended, insofar as it affected the plaintiff and the issues involved in this law suit during its tax year ended June 30, 1950, which this court adopts. Thus when the partners sold the patent applications to the plaintiff and one resulted in a patent, the following tax consequences ensued:

(A) The partners realized a gain upon the sale which was taxable to capital gains rates and since they were on the cash basis and the purchase price was payable on installments for the period February 14 to June 30, 1950 the tax was payable in the year the installments were received.

(B) The plaintiff takes as its basis for depreciation and subsequent disposition, the purchase price of the patent, that is the installment payments for the period February 14 to June 30, 1950.

However, the burden is upon the plaintiff to prove that it made a bona fide purchase of the applications for patent from the partners; that the transfer thereof was not in exchange for capital stock or securities of plaintiff, or a contribution to capital of the plaintiff in any

form. If the plaintiff fails in this proof then the transfer was in all respects within the provisions of Section 112(b) (5) of the Internal Revenue Code of 1939, as amended, and the basis of the tax for plaintiff would be zero the same as it would have been for the partners pursuant to Section 113(a) (8) of the Internal Revenue Code 1939, as amended. If plaintiff fails in this proof, it could not take a deduction for depreciation for the installment payments due for the period February 14, to June 30, 1950.

While not all in conflict, there is some evidence as to these issues which is subject to different interpretation and conclusions. In weighing this evidence the court has sought to determine the intention of the partners, the plaintiff, and its stockholders as of the time of the transaction September 1, 1949 and the evidence subsequent thereto that would reflect the intent of such persons as of September 1, 1949. It is my conclusion that the defendant's hindsight observation of the evidence of transactions subsequent to September 1, 1949 does not disclose anything but the ultimate fact that a bona fide sale was made by the partners to the plaintiff and that the transfer of the patent applications was not in exchange for capital stock or securities of the plaintiff nor a contribution to capital of plaintiff in any form. After duly weighing the evidence, and with the benefit of the arguments of counsel and their briefs the court finds the following facts and makes its conclusions of law thereon.

### Findings of Fact

1. The plaintiff is a corporation duly organized and existing under the laws of the State of Indiana and qualified to do business in such state on September 1, 1949. The corporation was dominated and controlled by Sarkes Tarzian and Mary Tarzian as stockholders, directors, and officers. Their two minor children

---

2. " * * * this bill is intended to forestall the practice of selling depreciable assets to controlled corporations in order to obtain the substantial tax benefit available *Under Existing Law* * * * will apply only to sales or exchanges made after May 3, 1951, * * * " (Italics added.)

also became stockholders in September of 1953.

The plaintiff used an accrual system of accounting, within the meaning of the Internal Revenue Code of 1939 as amended, at all times pertaining to this action. Its first annual accounting period and fiscal and taxpaying year terminated on June 30, 1950.

2. The action is under Section 7422 of the Revenue Code of 1954 relating to suits for refund of taxes erroneously and illegally assessed and collected and involves the interpretation and application of the Internal Revenue Code. The action is brought in this court pursuant to the act of June 25, 1948, c. 646, 62 Stat. 933, as amended, being Title 28 U.S.C.A. § 1346.

3. In 1945 Sarkes Tarzian left his employment as chief engineer for Radio Corporation of America and together with his wife, Mary Tarzian, formed a partnership to engage in various types of engineering for the radio and television industries. By 1949, they owned a radio station, were in the process of constructing a television station, were conducting an engineering business and had commenced the manufacture of automatic television tuners under an application for letters patent described as the Valdettaro patent. Mary Tarzian, the wife and business partner of Sarkes Tarzian, was an educated woman with a Bachelor's Degree in 1927 from the University of Pennsylvania, and a Master's Degree in 1928 from the same institution. She studied on a scholarship for two years abroad and returned to finish her education at the University of Pennsylvania where she earned her Ph.D. Degree. She worked with her husband in the partnership in charge of personnel and after the corporation was organized, she exclusively handled the personnel work including the negotiation of some labor trouble.

Sarkes and Mary Tarzian were both working partners contributing their time and ingenuity to the partnership.

Sarkes and Mary Tarzian were both working officers and directors of the plaintiff corporation and contributed their time and ingenuity to the corporation for a salary.

4. The manufacture of tuners was carried on as a special division of the partnership.

5. The American Steel Package Company on February 11, 1948, commenced negotiations with the partnership for the merging of its Tuner Division with the operation of American Steel Package Company. This merger was believed desirable since the latter company was manufacturing variable condensers used in tuning radio sets and the Tuner Division of the partnership was manufacturing automatic tuners for television sets. These negotiations continued through the years 1948 and 1949 but no merger was ever consummated and the negotiations finally terminated February 6, 1950.

6. In the late summer of 1949, Sarkes and Mary Tarzian decided to incorporate the Tuner Division, but, in light of pending negotiations for merging with the American Steel Package Company and for other business and personal reasons decided to sell the tuner patent applications rather than contribute them to the capital of the new corporation.

7. On September 1, 1949, plaintiff acquired, pursuant to a written agreement of sale, all rights to two patent applications on tuners (No. 16771, Valdettaro and No. 772773, Weigel) and patents to be issued thereon from the partnership of Sarkes Tarzian and Mary Tarzian which contract was in substance as follows:

The contract conveyed the entire right, title and interest of the said partnership in two applications, for letters patent, of the United States, Serial Nos. 772773 and 16771 and the inventions covered thereby and the letters patent that may be granted thereon in the United States, or any division, renewal or reissue of said applications, to the plaintiff. It further provided that for and during the period of twenty years from the date of the contract that the plaintiff would pay the partnership as installments on the pur-

chase price made, a sum equal to 2½% of the plaintiff's selling price or the sum of 30 cents, whichever sum is greater, for each and every "tuner" covered by the said patent applications sold or otherwise disposed of for a consideration by the plaintiff, and a sum equal to 2% of the selling price of any licensee of the plaintiff or the sum of 10 cents, whichever sum is greater for each and every one of said "tuners" sold or otherwise disposed of for a consideration by any licensee of the plaintiff. Said contract further provided that the said "tuners" sold by the plaintiff or its licensees shall be subject to payment by the plaintiff of the installment payments of the purchase price above referred to only on account of the first sale thereof or could dispose for a consideration; however, credit risks of the purchasers of the plaintiff and its licensees were not to be assumed by the partnership and the partners were entitled to the installment payments of the purchase price regardless of the payment by customers of the plaintiff or its licensees. Said contract further provided that within 60 days following the close of each calendar quarter the plaintiff shall furnish the partners a report of the sales of the "tuners" within the last complete quarter and therewith shall make payment to the partners of all sums owing as installments on the purchase price for these applications of letters patent. The plaintiff further agreed to make available to the partners at reasonable times for inspection and audit, all accounts and records of the plaintiff relating to the sale of the said "tuners" by the plaintiff or its licensees. The plaintiff further agreed to protect the validity of said applications for letters patent, renewal or a reissue thereof, and the letters patent that may be granted, and to pay for all regular and other expenses to save the integrity of said applications and resulting letters patent. The plaintiff further agreed to cause notice of patent application for patent notice required by law to be placed on all units of the "tuners." Plaintiff further agreed that any licensing agreement entered into by it will be in writing and a fully executed copy thereof would be delivered to the partners. Plaintiff further agreed that any such licensing agreement with respect to the manufacturing, use or sale by the licensee of the said "tuners" shall provide for the payment by its licensee to the plaintiff of a consideration of not less than 2% of the selling price of the licensee, or the sum of 10 cents whichever sum is greater, for each and every one of the said "tuners" sold or otherwise disposed of for a consideration by the licensee. Said contract further provided that such licensing agreements shall expressly provide that the licensee shall furnish to the plaintiff within 60 days following the close of each calendar quarter, a report and payment on "tuners" manufactured and sold for a consideration. It was also agreed that said licensing agreement shall also provide that the plaintiff at reasonable times may inspect and audit the records of the licensee relating to the sale of said "tuners." It also further agreed that the licensing agreements shall expressly provide that the licensee shall cause a notice of the patent application and patent notice required by law on all units of "tuners."

The partners on September 1, 1949, did execute in writing their two "patent deeds before issue" for the said applications for letters patent of the United States to the plaintiff which was recorded in the United States Patent Office on November 25, 1949, and recorded in volume F 222 at pages 154, 159 and 160.

The consideration stated in the foregoing contract for the sale of the applications for letters patent by the partners to the plaintiff and patent deeds were based on the same price per unit as the partners had been receiving under a licensing agreement with Magnavox Corporation prior to the date of incorporation of the plaintiff and of this contract. Following the plaintiff's incorporation, the Magnavox Corporation relinquished its license with the partnership and entered into a written contract with the plaintiff to purchase manufactured "tuners" from the plaintiff.

8. The plaintiff did not issue or exchange notes, securities or stock to the partners for the patent applications on September 1, 1949 or at any time during the fiscal year ended June 30, 1950. The partners did not contribute the patent applications to the plaintiff's capital on September 1, 1949 or at any time during the fiscal year ended June 30, 1950. The transfer of the patent applications was a bona fide intended and actual sale and for no other consideration than stated therein on September 1, 1949 and remained such continuously through the fiscal year ended June 30, 1950. The contract for the sale of the patent applications was reasonable and fair in its terms including the price on September 1, 1949 and at all times during the fiscal year ended June 30, 1950.

9. A patent was issued on February 14, 1950, on application No. 16771 (Valdettaro) being U. S. Letters Patent No. 2,497,747.

No patent was ever issued on application No. 772773, (Weigel) and it has been abandoned and no manufacturing has been undertaken under this application.

All manufacturing and sales of tuners by plaintiff has been under the Valdettaro application and letters patent.

10. On September 1, 1949, by another written contract the plaintiff acquired the physical plant, works in process, inventory, production know-how, and contracts with customers of the Tuner Division of Sarkes Tarzian and Mary Tarzian, partners, in exchange for the common stock of plaintiff.

11. On September 1, 1949, by another written contract the said partnership loaned plaintiff $60,000 in cash and sold plaintiff raw materials inventory at its cost in the amount of $96,722.97.

12. The liabilities incurred in item eleven of these findings by plaintiff at the time of incorporation were substantially discharged within four months after incorporation.

13. The assets described in item ten of these findings which were transferred in exchange for common stock included orders on hand for tuners in the amount of $565,932, production and engineering data, and the entire organization and work staff of the partnership tuner division.

The gross profit ratio on tuner sales at that time was approximately 36½ per cent. The book value of the assets transferred to plaintiff in exchange for its stock was $31,860.

Those assets had a going concern value so that the fair market of the stock or net worth of plaintiff on September 1, 1949, was at least $322,000; more than twice the liabilities assumed by plaintiff of $156,722.97.

Plaintiff was adequately capitalized on September 1, 1949, in that the true ratio of the value of its equity capital to its debts was at least two to one.

14. The business of the plaintiff expanded at a rapid rate as did the infant television industry and additional plant facilities and operations were acquired, which change was unknown on September 1, 1949. In the ensuing years plaintiff earned:

| Years Ended June 30 | Before Tax | After Tax |
|---|---|---|
| 1950 | $2,000,000 | $1,200,000 |
| 1951 | 465,000 | 235,000 |
| 1952 | 426,000 | 246,000 |
| 1953 | 3,458,000 | 1,708,000 |
| 1954 | 1,111,000 | 526,000 |
| 1955 | 1,996,000 | 946,000 |

No dividends have been paid by plaintiff since the time of its incorporation, and the Government has not asserted any liability for unreasonable accumulation of surplus. The retention of all earnings was necessitated by the needs and growth of the business and such was unknown to the plaintiff and the partners on September 1, 1949. Plaintiff paid reasonable, substantial salaries to its working officers, Sarkes and Mary Tarzian.

15. The applications for patent sale contract of September 1, 1949, called for calendar quarterly accounting and pay-

ment 60 days after the quarters ended. No accounting or payment was made on November 29, 1949 for the first partial quarter ended September 30, 1949. No accounting or payment was made on February 29, 1950 for the second quarter ended December 31, 1949. No accounting or payment was made on May 30, 1950 for the third quarter ended March 31, 1950. No accounting or payment was made on August 29, 1950 for the fourth quarter of the fiscal year ended June 30, 1950. By the date of June 30, 1950, there was accrued indebtedness of plaintiff to the partners under said contract the sum of $156,819.96.

Full accounting was made by the plaintiff to the partners under said contract for all of the quarters above enumerated on September 13, 1950 and the indebtedness was fully paid by the plaintiff to the partners as evidenced by its check dated September 13, 1950 in the amount of $156,819.96 which was cashed by the partnership the same date at a Bloomington, Indiana bank. No interest was paid the partners for these late payments nor was there any provision in the said contract therefor and none was charged because of the reasons hereinafter set forth.

There was no intention of plaintiff or the partnership by said delay in payments to contribute even temporarily to the capital of the plaintiff's said accrued quarterly indebtedness during the fiscal year ended June 30, 1950. The delayed accounting and payment of said accrued quarterly indebtedness was due to a shortage of office and accounting personnel because of the plaintiff's rapidly expanding business production in the booming television industry and the resulting office detail to the extent that the professional accounting firm overburdened and understaffed in the spring of 1950 recommended to plaintiff that such firm was too small to handle its accounting. Plaintiff then engaged a nationally known accounting firm who promptly audited the plaintiff's enterprise and was able among its other duties to complete the said necessary accounting for said payment on September 13, 1950 to the partners.

The partnership reported said $156,819.96 in its United States Income tax return for the year 1950. The partners reported and paid tax thereon in their individual United States Income tax returns for the year 1950. Defendant has not offered to refund such tax paid to said partners.

16. In the summer of the year 1950, the plaintiff conceived the idea to expand its industry to include a division with separate manufacturing plant facilities at Batavia, Illinois, for the manufacture of "picture tubes" for television receiving sets. This was not contemplated on September 1, 1949 by the plaintiff, its stockholders or officers nor by the partners.

For the exclusive purpose of said new division to the plaintiff's industry, the plaintiff made application to the Harris Trust and Savings Bank, of Chicago, Illinois, for a commercial unsecured loan of $100,000 which was granted August 21, 1950. This bank further committed itself to the plaintiff to loan up to $500,000 upon the pledge of plaintiff's accounts receivables. The plaintiff on advice of its comptroller because of the excessive detail never borrowed under this commitment nor pledged any accounts receivable and later the commitment agreement was cancelled.

The plaintiff, for the exclusive purpose of said new division to the plaintiff's industry, made application to the partners for an unsecured loan. On September 13, 1950 the partners loaned the plaintiff as evidenced by cancelled check and two promissory notes totally $210,000 respectively in the amount of $150,000 and $60,000. This loan was not contemplated by the plaintiff or the partnership on September 1, 1949 and was not a contribution to capital, nor was the patent exchanged for stock or securities of plaintiff on September 13, 1950 but was wholly due to the intervening new plans of the Batavia, Illinois, "picture tube" operations of the plaintiff. It in no way

changed the form or substance of the application for patent sales contract of September 1, 1949 or at any time during the tax year ended June 30, 1950.

In the fall of 1950, because of the development of the "picture tube" division of plaintiff at Batavia, Illinois, the plaintiff considered a public issue of its stock. It consulted experts, including representatives of two security underwriting firms who recommended the per unit payment agreement in the patent application sales contract of September 1, 1949 be replaced by a lump sum liability because of the March 1950 decision in which the Commissioner of Internal Revenue withdrew acquiescence in the case of Edward C. Myers, 1946, 6 T.C. 258, acq. 1946—1 C.B. 3, withdrawn Minn. 6490, 1950, C.B. 9. This case attracted the attention of taxpayers to the fact that, in the taxable years commencing after June 30, 1950, per unit payments under patent purchase agreements which had theretofore been qualified for capital gains treatment might not be so treated by the Commissioner of Internal Revenue. The plaintiff and the partners then amended the applications for patent sale contract of September 1, 1949 on January 15, 1950 which is detailed in finding of fact number 17.

For the exclusive purpose of said new division to the plaintiff's industry the plaintiff made application to the Harris Trust and Savings Bank, of Chicago, Illinois, for a commercial unsecured loan of an additional $200,000 which was granted January 16, 1950.

Plaintiff by the end of the fiscal year June 30, 1951 had invested in the Batavia, Illinois, plant and "picture tube" division $532,000 in fixed assets, $250,000 in working capital, and $800,000 to make good the losses experienced by the "picture tube" division in that fiscal year.

Because of the losses experienced by the "picture tube" division of the plaintiff and general depressed condition of the television industry and plaintiff's unsecured debt to the Harris Trust and Savings Bank of $300,000 the bank sought some additional protection. On March 13, 1951, an interim agreement was entered into between the partners, the plaintiff and the bank to subordinate all indebtedness of the plaintiff including that due the partners to the bank's claims against plaintiff. The interim agreement further provided that the plaintiff and partnership within 30 days would cause all presently existing indebtedness subordinated to be evidenced by a subordinated note or notes containing like terms, or terms to be agreed upon.

For the exclusive purpose of said new "picture tube" division of plaintiff's industry the plaintiff made application to the partners for an unsecured loan. On April 4, 1951 the partners loaned the plaintiff the sum of $16,000 as evidenced by a check and a promissory note.

For the exclusive purpose of said new "picture tube" division of plaintiff's industry the plaintiff made application to the said bank for an unsecured additional loan. On June 4, 1951 the bank loaned the plaintiff the sum of $195,000.

For the exclusive purpose of said new "picture tube" division of plaintiff's industry the plaintiff made application to the partners for an unsecured loan. The partners loaned the plaintiff the sum of $124,000 as evidenced by a check dated June 22, 1951 and a promissory note dated June 20, 1951.

Pursuant to the 30 day provision of the March 13, 1951 interim subordination agreement the same parties thereto on June 21, 1951 entered into a subordination agreement. The agreement recited that plaintiff was then indebted to the partners in the sum of $350,000 (this amount was made up of said unsecured notes of September 13, 1950 in amount of $150,000; September 13, 1950 in amount of $60,000; April 4, 1951 in amount of $16,000; and June 20, 1951 in amount of $124,000). The agreement provided that the partners surrender a total of their $150,000 notes against delivery to the partners a note of plaintiff to the partners 4% subordinated note or notes junior to the debt of plaintiff to the bank then in the sum of $495,000. In

addition, the agreement provided that so long as the bank's claims against plaintiff were unpaid that any future payments due from plaintiff to the partners under the amended patent agreement of January 15, 1951 (set forth in finding of fact number 17) the plaintiff will execute and deliver and the partners accept 4% subordinated notes. The remaining $200,000 of the notes due the partners from plaintiff were by said contract subordinated only as to payments on principal. In the preamble to this agreement it was recited erroneously that the said $350,000 in notes of plaintiff to the partners evidenced part of the indebtedness of the plaintiff to the partners out of the written contract for the sale of applications for patent of September 1, 1949 and the amended patent sale contract of January 15, 1951. This agreement was prepared jointly by the bank's attorneys and the former attorneys of the plaintiff who advised the parties signatory thereto. This agreement was not reviewed by plaintiff's accountants before execution. The transactions and records of the plaintiff and the partners in this respect were not truly or accurately recited in said preamble to the subordination agreement in that said $350,000 in notes did not evidence part of the indebtedness of plaintiff to the partners but were independent loans.

For the exclusive purpose of said new "picture tube" division of plaintiff's industry the plaintiff made application to the said bank for an additional loan. On October 3, 1951 the bank loaned the plaintiff the sum of $105,000 which came within the said subordination agreement of June 22, 1951. The plaintiff now owed the bank the total principal sum of $650,000.

The foregoing loan and subordination agreements or the need for such additional financing was never contemplated by the partners or the plaintiff on September 1, 1949 or at any time during the fiscal year ended June 30, 1950. Said transactions do not reflect any intention in the September 1, 1949 contract for sale of the applications for patent as a contribution to capital in any form or substance on September 1, 1949 or at any time during the fiscal year ended June 30, 1950, nor an exchange for stock or securities of plaintiff on said date or during said fiscal year but were due to an unforeseen intervening new venture in expansion development of the business of the plaintiff.

No accounting or payment was made on time as agreed in the applications for patent sales contract of September 1, 1949 for the period of July 1, 1950 through December 31, 1950 and on this date there was accrued and owing the partners from plaintiff the sum of $118,265.96. Full accounting was thereafter made by plaintiff to the partners for said period on June 22, 1951 as evidenced by a check from plaintiff to the partners in the amount of $124,000 which included a payment for some additional debt in an amount representing the difference of the said $118,265.96. No interest was paid nor was there any provision in the said contract of September 1, 1949 therefor and none was charged for the reason the plaintiff was experiencing a depressed television market and huge losses in the "picture tube" division. The partnership reported said $118,265.96 in its United States Income tax return for the year 1951. The partners reported and paid tax thereon in their individual United States Income tax returns for the year 1951. Defendant has not offered to refund such tax to the said partners. These transactions concerning the $118,265.96 do not reflect any intention in the September 1, 1949 contract for the sale of the applications for patent as a contribution to capital in any form or substance on September 1, 1949 or at any time during the fiscal year ended June 30, 1950, nor an exchange for stocks or securities of plaintiff on said date or during said fiscal year, but were due to an unforeseen intervening new venture in expansion development of the business of plaintiff.

The accrued claims of $156,819.96 of the partners against the plaintiff were never subordinated to any one, including

said bank nor was said claim of the partners against plaintiff for $118,265.96 which accrued for the period July 1, 1950 to December 31, 1950.

17. On January 15, 1951, effective January 1, 1951, the sales contract of September 1, 1949, for the patent was amended in writing to provide for a fixed consideration instead of per unit payment.

The amended contract was due to changing circumstances which occurred after September 1, 1949, and before January 1, 1951, which caused plaintiff to adjust its affairs. The principal changing circumstances were as follows:

(A) In March of 1950 the Commissioner of Internal Revenue withdrew acquiescence in the case of Edward C. Myers, 1946, 6 T.C. 258, acq. 1946—1 C.B. 3, withdrawn Minn. 6490, 1950, C.B. 9. This attracted the attention of taxpayers to the fact that, in the taxable years commencing after June 30, 1950, per unit payments under patent purchase agreements which had theretofore been qualified for capital gains treatment might not be so treated.

(B) In the fall of the year of 1950, the plaintiff considered a public issue of its stock. It consulted experts, including representatives of two security underwriting firms who recommended the per unit agreement be replaced by a lump sum liability.

(C) A patent had been issued to the plaintiff February 14, 1950.

(D) The plaintiff was able to make a realistic appraisal of the patent, after sixteen months experience with manufacturing, sales, and acceptance of its product in the tuner market.

(E) The expansion of plaintiff to include a "picture tube" division as set forth in finding of fact 16.

The consideration and other terms of the amended agreement were fair and reasonable on January 1, 1951, and the parties intended the transfer and sale and there was no other consideration.

The partners did not contribute the patent to the capital of plaintiff in any way, nor did they exchange the patent for stock or securities of the plaintiff in any way and it was a bona fide amended contract of sale.

18. An March 2, 1951, the first payment of $10,000 cash was paid by plaintiff to the partners under the amended sales agreement of January 15, 1951.

In January of 1952 the second payment of $140,000 was paid by plaintiff to the partners under the amended sales agreement of January 15, 1951 by means of a promissory note and it is still unpaid.

None of the remaining four payments of $150,000 each which were due in January 1953, 1954, 1955, and 1956 have been paid which total $600,000.

Interest has been paid by the plaintiff to the partnership on the promissory note of January 1952 in the principal sum of $140,000.

The plaintiff has paid the partnership in full for $100,000 unsubordinated note reissued out of the notes of September 13, 1950, April 4, 1951, and June 20, 1951, totalling $350,000 the balance of which $250,000 was subordinated all of which is referred to in finding of fact number 16.

19. The plaintiff, the partners and said bank on May 28, 1952 entered into a supplemental agreement to the subordination agreement of June 22, 1951, which is recited in finding of fact number 16. This supplemental contract provided for the partners to surrender the $200,000 note which was only restrictively subordinated in the original agreement against delivery by plaintiff to the partners of two notes of $100,000 each bearing 4% interest one of which is wholly subordinated to the bank's said indebtedness in the principal amount of $650,000 and the other restrictively subordinated thereto. Simultaneously, the $140,000 note referred to in finding of fact number 18 was subordinated by replacing it with a note reciting subordination to the said

claims of the bank and was dated May 28, 1952.

The said parties on June 27, 1952 entered into a supplemental agreement to the subordination agreement of June 25, 1951, which is recited in finding of fact number 16. This supplemental contract provided that the maturity dates of the subordinated notes executed June 21, 1951 in the amount of $150,000 be extended to January 1, 1954; of May 28, 1952 in the amount of $100,000 be extended to January 1, 1954; of May 28, 1952 in the amount of $140,000 be extended to January 1, 1954; of the annual installment of $150,000 due under the amended patent sale contract of January 15, 1951 be extended to January 1, 1954. Said supplemental agreement further recited that is shall not affect or modify the terms and provisions of the applications for patent sale contract of September 1, 1949 or the amended contract of January 15, 1951 except as modified by the supplemental subordination agreement. In the preamble to this agreement it was recited erroneously that the $250,000 in two subordinated notes dated June 21, 1951 of $150,000, and May 28, 1952 of $100,000 indebtedness of plaintiff to the partners was incurred by the written contract for the sale of the applications for patent and the amended patent sales. contract of January 15, 1951 for the same reason as listed in finding of fact number 16 concerning the original subordination agreement of June 21, 1951. This $250,000 in notes does not evidence part of the indebtedness of plaintiff to the partners for the sale of the patent or applications for patents but were independent loans.

The foregoing transactions were not contemplated by the plaintiff or the partners on September 1, 1949 or at any time during the fiscal year ended June 30, 1950. They do not reflect any intention on September 1, 1949 or at any time during the fiscal year ended June 30, 1950 for the sale of the applications for patent as a contribution to capital in any form or substance, nor an exchange for stock or securities of plaintiff on said date or during said fiscal year but were to an unforeseen intervening new venture in expansion development of the business of the plaintiff.

20. Even if the court went so far as to construe that commencing with the transaction of September 13, 1950 when the partners loaned the plaintiff $210,000 as detailed in finding of fact 16 and all of the subsequent transactions set forth in said finding and findings of fact numbered 17 through 19 amounted to an outright contribution of the applications for patent and the resulting patent to the capital of plaintiff by the partners, or was in fact an exchange for capital stock or securities of the plaintiff on September 13, 1950 or at any date thereafter I do not believe it affects the status of the parties or their intention in substance or in form as to the sale contract of the applications for patent on September 1, 1949 or at any time during the fiscal year ended June 30, 1950. There is no reflection back on the September 1, 1949 transactions because of the intervening new venture into the "picture tube" division of the plaintiff calling for new finance and refinancing because of the losses experienced in the new venture. Careful scrutiny of the entire transaction of all the evidence discloses no suspicion of the partner's intention to contribute the patent applications to capital in any manner on September 1, 1949, and discloses no suspicion of the partner's intention to exchange the patent applications for stock or securities of the plaintiff on September 1, 1949. The first suspicion that such was the case could only develop commencing with the transactions of September 13, 1950 but when weighed with the other evidence, principally the intervening new venture there was new cause for the partners to invest by loan money from whatever source they could get it with the plaintiff when they could not satisfactorily and quickly obtain it from others or satisfactorily and quickly get it from the sale of stock to the public.

21. Plaintiff filed its Federal Tax return for its taxable year ended June 30, 1950, on November 12, 1950, with the Director of Internal Revenue of the District of Indiana at Indianapolis, Indiana, and plaintiff was assessed by and paid to the Treasury Department of the United States the sum of $843,467.01 as its income tax for the said taxable year.

22. On November 10, 1953, and again on April 21, 1954, a form granting an extension of time for the assessment of tax was signed by the plaintiff at the request of the Director of Internal Revenue, and these forms were filed with the Director of Internal Revenue at Indianapolis, Indiana.

Payments of plaintiff's tax liability for the taxable year ended June 30, 1950, were made as follows:

| | |
|---|---|
| September 14, 1950 | $ 95,000.00 |
| November 14, 1950 | 99,519.88 |
| December 21, 1950 | 193,612.08 |
| March 26, 1951 | 193,612.08 |
| June 18, 1951 | 193,612.07 |
| May 5, 1952 | 42,355.37 |
| May 21, 1952 | 125.33 |
| February 10, 1955 | 25,630.20 |

23. On March 22, 1954, plaintiff duly filed a properly executed claim for refund on Form 843 with the Director of Internal Revenue for the District of Indiana at Indianapolis, Indiana, claiming a refund for taxes illegally, erroneously, or excessively collected in the amount of $44,425.02, plus interest at 6% per annum from the date of payment on June 18, 1951, May 5, 1952, and May 21, 1952, for the taxable year ended June 30, 1950. Since the commencement of the action plaintiff has abandoned $2,069.65 of this refund claim reducing it to the amount of $42,355.37.

In the plaintiff's taxable year ended June 30, 1950, there accrued $156,819.96 in installment payments due under the patent sale contract of September 1, 1949, which were paid by check on September 13, 1950. The total number of tuners sold by plaintiff in said tax year was 513,060 at a total sales price of $2,504,-654.42. Of the said total tuners sold in said tax year 263,759 were sold in the period September 1, 1949 through February 13, 1950, to the date of patent issuance, at a price of $1,796,853.97 and installment payments of $79,802.65 were due under the patent sale contract of September 1, 1949. Of the said total tuners sold in said tax year 249,301 were sold in the period February 14, 1950, the date of the patent issuance, through June 30, 1950, at a price of $707,800.45 and installment payments of $77,017.31 were due under the patent sale contract of September 1, 1949.

The plaintiff in said tax return referred to in item twenty-one of these findings, deducted the sum of $156,819.96 on the basis that its total cost in purchasing the applications for patent could not be determined at the end of the said tax year and since the cost payments made on the purchase price in the taxable year were attributable to units produced in that year, no distortion of income resulted.

After the filing of said return on November 12, 1950, an agent of the Internal Revenue Service disallowed the sum of $107,772.86 of the $156,819.96 deduction of plaintiff's tax return and allowed a deduction of $49,047.10 of the $156,819.96 item and also allowed an additional depreciation of other items on the return of $5,446.45 resulting in a net disallowance of $102,326.41.

The deficiency in tax resulting from this disallowance plus interest thereon, which plaintiff has paid was in the sum of $42,335.37 and is set forth in item twenty-two of these findings.

This overpayment of $42,335.37 plus an overpayment of tax in the amount of $2,069.65 resulting from additional deductions for depreciation allowed by defendant over amounts claimed by plaintiff on its said return represents the amount claimed in the refund claim of March 22, 1954, first above referred to in this item of the findings. But the claim has been reduced to $42,335.37 by the plaintiff

abandoning the $2,069.65 item of the claim.

24. The refund claim of March 22, 1954, referred to in item twenty-three of these findings has not been acted upon and has been neither approved nor denied and more than six months elapsed before the filing of plaintiff's action since the filing of said refund claim.

25. In a subsequent examination the same agent of the Internal Revenue Service disallowed the amount of $49,047.10, which he had previously allowed, as was referred to in item twenty-two of these findings.

The Internal Revenue Service by means of a jeopardy assessment, assessed an additional amount against plaintiff of $20,347.89 for the taxable year ended June 30, 1950, plus interest of $5,282.31 or a total of $25,630.20. This amount was paid by plaintiff as referred to in item twenty-two of these findings.

On June 2, 1955, plaintiff duly filed a properly executed claim for refund on Form 843 with the Director of Internal Revenue for the District of Indiana at Indianapolis, Indiana, claiming a refund for taxes illegally, erroneously, or excessively collected in the amount of $25,-630.20 plus interest at 6% per annum from the date of payment February 10, 1955.

26. The refund claim of June 2, 1955 referred to in item twenty-five of these findings was disallowed on June 23, 1955 by the Director of Internal Revenue for the District of Indiana mailing to plaintiff, by registered mail, a notice of disallowance in full of the said claim for refund in the amount of $25,630.20 for said tax year.

27. The deduction for depreciation claimed by the plaintiff for the installment payments for the applications for the patent and resulting patent assets during the tax year ended June 30, 1950, in terms of cash cost the plaintiff $156,-819.96.

The plaintiff and said sellers of the applications for the patent and the resulting patent on September 1, 1949, and during the entire plaintiff's tax year ended June 30, 1950, intended such sale to be an absolute sale and not an exchange for capital stock or securities of plaintiff corporation.

The transactions subsequent to June 30, 1950 including: (1) The delayed payments of installments; (2) Revision of the sales contract which established a fixed balance of the purchase price of $750,000 in January of 1951; (3) Payments under the amended January 1951 contract by promissory notes bearing interest but still unpaid; (4) Subordination contracts of the sales contract payments due or to be due the seller to the Harris Trust and Savings Bank of Chicago, Illinois, March 13, 1951, June 21, 1951, and May 28, 1952; (5) The failure to pay interest on the delayed payments of 1949 and 1950; (6) And the failure to pay interest when due on the promissory note payments; were not contemplated on September 1, 1949, or at any time during the tax year ended June 30, 1950, but were new intervening plans motivated by the need for new additional finance for plaintiff long after the year in question. The need for new finance arose because of expansion of plaintiff's business, an industry depression, and a new venture of the plaintiff, tube manufacture, in the State of Illinois which was causing large losses. These transactions in no way changed the form or substance of the September 1, 1949, sales contract during the tax year ended June 30, 1950.

28. The transfer and sale of the patent applications and resulting patent did result in the most favorable tax treatment permitted by existing law to the sellers from an over-all tax point of view by permitting the sellers to pay income tax on the proceeds as capital gain, rather than as ordinary income. The dominant purpose of the sellers and this plaintiff in said transfer and sale was for sound business purposes and there was intended and resulted other business benefits and disabilities including but not limited to the tax consequences.

29. The sum of $77,017.31 owing under the patent sales contract of September 1, 1949 for the period February 14, 1950 to June 30, 1950, as represented in plaintiff's accounting to the partnership of Sarkes and Mary Tarzian on September 13, 1950, was an indebtedness accruing during the plaintiff's taxable year ending June 30, 1950. Said sum, within the meaning of the 1939 Internal Revenue Code, 53 Stat. 26 as amended by 56 Stat. 835, 26 U.S.C.A. § 48 (1948), is properly included as an indebtedness of plaintiff in its fiscal and taxable year ending June 30, 1950.

## Conclusions of Law.

1. The court has jurisdiction of the parties and of the subject matter in litigation.

2. The law is with the plaintiff and against the defendant on all of the issues of the pleadings pertaining to the claimed depreciation deduction for the letters patent installment payment under the sales contract of September 1, 1949, for the period February 14, 1950 to June 30, 1950, inclusive for the Valdettaro Patent Depreciation deductions are allowable on letters patent as assets. The plaintiff has maintained the burden of proof on these issues by a preponderance of the evidence.

3. The law is with the defendant and against the plaintiff on all of the issues of the pleadings pertaining to the claimed depreciation deduction for the applications for the patent installment payments under the sales contract of September 1, 1949, for the period September 1, 1949, to February 13, 1950 inclusive. Depreciation deductions are not allowable on patent applications as assets. The plaintiff has not and defendant has maintained the burden of proof on these issues.

4. The contract of September 1, 1949, for the sale of applications for patent to plaintiff was a bona fide sale and was not expressly or impliedly an exchange for capital stocks or securities of plaintiff. Plaintiff did not acquire the patent and/or its application as a contribution to capital.

5. Plaintiff is entitled to a deduction for depreciation in the sum of $77,017.-31 in its fiscal year 1950, being the installment payments due under the contract of September 1, 1949, for production under the letters patent (Valdettaro) for the period February 14, 1950 through June 30, 1950, pursuant to Section 23(*l*) of the Internal Revenue Code of 1939, 26 U.S.C.A. § 23(*l*). The installment payments which accrued during said tax year was the basis for depreciable cost of a capital asset and the depreciation or amortization expense is allowable to plaintiff for such part of the fractional year being an amount equal to the acquisition cost paid by plaintiff to the seller for such fiscal year.

6. The defendant has erroneously, illegally, and wrongfully assessed and collected tax and deficiency interest in the sum of $36,097.42 more than is legally owing and having been paid by plaintiff to defendant in three payments of $25,-630.20 on February 10, 1955, $125.33 on May, 21, 1952, and $10,341.89 on May 5, 1952, the plaintiff is entitled to judgment and recovery against defendant the paid tax and deficiency interest of $36,097.42 plus six per cent interest on the sum of $25,630.20 from the date of payment on February 10, 1955, to the date of refund payment by defendant, plus interest at the rate of six per cent per annum on the amount of $125.33 from the date of payment on May 21, 1952, to the date of refund payment by defendant, and plus interest at the rate of six per cent per annum on the amount of $10,341.89 from the date of payment on May 5, 1952, to the date of refund payment by defendant.

7. Every finding of fact deemed a conclusion of law is hereby concluded as a matter of law.

The clerk is directed to enter judgment accordingly.