**McCULLOUGH TOOL COMPANY, Petitioner,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

**No. 18258.**

United States Court of Appeals Ninth Circuit.

June 11, 1963.

Rehearing Denied July 25, 1963.

Wilson B. Copes, Wellman P. Thayer, and James E. Harrington, Los Angeles, Cal., for petitioners.

Louis F. Oberdorfer, Asst. Atty. Gen., Meyer Rothwacks, Lee A. Jackson, David O. Walter, and William A. Friedlander, Dept. of Justice, Washington, D. C., for respondent.

Before CHAMBERS and BARNES, Circuit Judges, and CURTIS, District Judge.

CURTIS, District Judge.

This petition for review involves federal excess profit taxes for the years 1951 and 1952. On January 9, 1957, the Commissioner of Internal Revenue notified the petitioner of deficiencies in the respective amounts of $104,690.01 and $86,898.80. Petitioner then filed a petition with the Tax Court for redetermination of the deficiencies under the provisions of Section 272 of the Internal Revenue Code of 1939. The Tax Court determined these deficiencies for the years 1951 and 1952 in the respective amounts of $126,104.46 and $740.52. Petitioner then filed this petition for review. Jurisdiction is conferred on this court by Section 7482 of the Internal Revenue Code of 1954.

The question presented here is whether certain fixed amounts, which the petitioner-corporation (taxpayer herein) had agreed to pay under modification agreements which purported to convert two patent licensing agreements into sales of the patents, could, in computing its excess profits tax credit, be treated as "borrowed capital", within the meaning of Section 439 of the Internal Revenue Code of 1939, in that the agreement to pay these amounts represented an unconditional "outstanding indebtedness" which was evidenced by one of the types of instruments prescribed in the statute —specifically, here, a promissory note.

The facts as stipulated and found by the Tax Court insofar as they are pertinent to this discussion are as follows:

The petitioner (hereafter referred to as taxpayer) is a corporation organized under the laws of the State of Nevada, with its principal place of business at Los Angeles, California. At all times pertinent herein 80 per cent of the stock of the taxpayer was owned by I. J. McCullough and 20 per cent was owned by his brother, O. J. McCullough. I. J. McCullough and O. J. McCullough are sometimes hereinafter referred to as the McCulloughs.

Since its inception in 1941, the taxpayer has been and is now engaged in the rendition of perforating and other highly specialized services to the oil drilling industry. The business in which the taxpayer is engaged is highly competitive and approximately 75 per cent of such business is founded on a number of patents which it either owns or is licensed to use.

Prior to January 1, 1944, the McCulloughs were the owners of certain patents (hereinafter referred to as the bul-

let patents) governing the manufacture, use, and sale of bullet-like projectiles for the perforation of oil wells.

On January 1, 1944, the taxpayer and the McCulloughs entered into an agreement whereby the taxpayer received an exclusive license to make, use, and sell devices manufactured in accordance with the bullet patents. The agreement provided, *inter alia*:

### "1.

"The Licensors hereby grant to the Licensee, upon and subject to the conditions, covenants, restrictions and terms hereinafter contained, the full and exclusive right and license during the continuance of this agreement to make, use and sell throughout the United States, its territories and possessions, devices made in accordance or disclosed in the aforesaid patents set forth on Exhibit A for the full term of said patents and until the expiration date of the last of said patents.

### "2.

"It is mutually understood and agreed that the license granted in Paragraph 1 hereof is granted subject to the condition that it does not and shall not empower the Licensee, directly or indirectly, to license any other person or persons, natural or artificial, to use said patents.

\*    \*    \*    \*    \*    \*

### "4.

"The Licensee further agrees to keep books, records, and accounts of all work performed during the life of this agreement of all work done hereunder, and all such records or accounts shall at and during the usual business hours be open to the inspection of the Licensors or their duly authorized representative.

### "5.

"On or before the 15th day of each calendar month after the execution hereof and during the continuance of this agreement the Licensee shall mail a statement to each of the Licensors containing the information required in Paragraph 4, hereof, showing all charges for use and sales by the Licensee under this agreement during the next preceeding [sic] calendar month.

### "6.

"In consideration of the rights and licenses herein given and granted by the Licensors to the Licensee, the Licensee agrees to pay to the Licensors at the time of rendering the statement required by Paragraph 5 hereof, a royalty consisting of a sum equal to twelve and one-half per cent (12½%) of the total gross price charged by the Licensee for all gun perforating done and all sales of parts and equipment in accordance with the herein license and patents, and one-fourth (¼) of the said royalty shall be paid to the Licensor O. J. McCullough and three-fourths (¾) of the said royalty shall be paid to the Licensor I. J. McCullough.

### "7.

"The Licensee shall have the right to terminate this agreement upon first giving ninety day notice in writing to the Licensors to cancel and terminate this agreement together with all rights, licenses and obligations hereunder, provided, however, that no such termination or cancellation shall relieve the Licensee from the payment of any royalty due and payable to the Licensors at the time of such termination.

### "8.

"In the event that either party shall violate any covenants of this agreement, the aggrieved party may give to the defaulting party written notice of such breach accompanied by sufficient particulars to reasonably enable the defaulting party to determine the alleged nature and extent of the breach, and if the defaulting party shall fail for a period of thirty days after the service of

such notice to remedy such breach, the aggrieved party may, at its option, terminate and cancel this agreement and all of the rights and licenses of any defaulting party hereunder. The waiver of any particular breach or breaches by the aggrieved party shall not be deemed to constitute a waiver of any continuing breach or of any future breach by the defaulting party of this agreement."

On October 1, 1947, the taxpayer entered into an exclusive license agreement with Earl J. Robishaw and William G. Sweetman regarding several patent applications (hereinafter referred to as the jet patents) governing the manufacture, use, and sale of shaped charges of explosives for the perforation of oil wells, devices sometimes known as jet perforators. The process of jet perforation of oil wells covered by the jet patents was not sufficiently developed at the time of the agreement to be commercially usable. The taxpayer under the agreement undertook the responsibility and expense of further development of the jet patents. In all other material respects the agreement was similar to the agreement for the bullet patents except as to the amount of royalty, the length of periods for notice of termination, and the transferability of the license. The agreement makes no mention of the right to grant sublicenses.

Neither Robishaw nor Sweetman was an employee of the taxpayer on October 1, 1947.

In July, 1948, each of the McCulloughs acquired a 25 per cent interest in the jet patents. At that time the jet patents were still not commercially usable.

On December 28, 1950, the McCulloughs and the taxpayer executed a document entitled "Modification Agreement" which provided:

"WHEREAS, the parties hereto on the first day of January, 1944 did make and enter into an Agreement by which the [McCulloughs] sold to the [taxpayer] certain patents and patent applications listed on Exhibit 'A' attached thereto; and

"WHEREAS, said Agreement was termed a 'License Agreement' and the parties thereto were referred to as Licensors and Licensee, respectively, although the Agreement was intended to be, and, in law, was actually an agreement of sale; and

"WHEREAS, Paragraph 6 of said Agreement provided for payments to the [McCulloughs], which payments were termed 'royalty', of 12½% of the total gross price received by the [taxpayer] for services and sales under said patents and patent applications; and

"WHEREAS, the parties are desirous of modifying said provision for payment and substituting therefor a fixed and determinable total remaining price to be paid by the [taxpayer] in consideration for the sale of the said patents;

"NOW, THEREFORE, in consideration of the mutual promises of the parties hereto, IT IS AGREED AS FOLLOWS:

"1. Paragraph 6 of said Agreement of January 1, 1944 is modified to read as follows:

"6

"In consideration of the rights in and to the patents and patent applications transferred, assigned and sold by the [McCulloughs] to the [taxpayer], the [taxpayer] hereby agrees to pay to the [McCulloughs], in addition to all other payments heretofore made hereunder, $20,000.00 per month on the 28th day of each calendar month, commencing on the 28th day of December, 1950, for a period of six years and one month. The last of said monthly payments shall be due and payable on the 28th day of December, 1956. One-fourth of each of said monthly payments, or $5,000.00, shall be paid to O. J. McCullough, and three-fourths of said monthly

payments, or $15,000.00 shall be paid to I. J. McCullough. The parties are agreed that the total of these payments, $1,460,000.00, shall be the full remaining price to be paid by the [taxpayer] for the complete and absolute ownership of the patents and patent applications described in Exhibit 'A.'

"2. It is agreed by the parties hereto that any and all provisions of said Agreement of January 1, 1944 which are inconsistent with this Modification Agreement shall have no effect. Said Agreement of January 1, 1944 has been considered by the parties thereto as an absolute assignment or sale of the subject matter thereof. That Agreement together with this Modification thereof shall be similarly construed hereafter."

On December 28, 1950, the parties to the jet patent agreement or their assignees entered into similar modification agreements, the effect of which, *inter alia* was to substitute the total price of $2,870,000 for the payment of a royalty. In all other respects the agreements were almost identical to the modification agreement relating to bullet patents.

The taxpayer made all payments for the bullet patents due to McCulloughs under the modification agreement.

The taxpayer has made all payments for the jet patents due to the owners or assignees under the modification agreement. The taxpayer has made no attempt to terminate the agreement and in 1952 made advances to one of the par-

ties of payments due for the five years next ensuing.

The Tax Court sustained the determination of the Commissioner that the taxpayer is not entitled to include its obligation under the modification agreements of 1950 as "borrowed capital" for the purpose of computing its excess profits tax credit. The taxpayer brings that decision here for review.

■ In order to qualify as "borrowed capital" under the provisions of Section 439 of the Internal Revenue Code of 1939 and thus be includable in the computation of the taxpayers' excess profits tax credit, an obligation of the taxpayer must be an unconditional outstanding obligation and it must be evidenced by one of nine instruments named in the Statute.[1] The Tax Court found that the modification agreements of December 1950 were none of these.

Petitioner contends that the license agreements as modified create an unconditional promise to pay and therefore come within the definitions of a "note", one of the instruments designated in the Statute.

■ With this reasoning we cannot agree. Although an arguable question arises as to whether the obligation of the taxpayer under the instruments in question is unconditional or not, we prefer to place our decision upon the grounds that even though the obligation be unconditional, the instruments cannot be construed to be "notes" within the meaning of Section 439. Respondent fails to distinguish between the nature of the *instruments* on the one hand and the *obligations* which they evidence on the

---

1. Section 439 (as added by Section 101, Excess Profits Tax Act of 1950)
"Borrowed capital

"(a) *Average Borrowed Capital.* For the purposes of this subchapter, the average borrowed capital for any taxable year shall be the aggregate of the daily borrowed capital for each day of such taxable year, divided by the number of days in such taxable year.

"(b) *Daily Borrowed Capital.* For the purposes of this subchapter, the daily borrowed capital for any day of any

taxable year shall be determined as of the beginning of such day and shall be the sum of the following:

"(1) The amount of the outstanding indebtedness (not including interest) of the taxpayer, incurred in good faith for the purposes of the business, which is evidenced by a bond, note, bill of exchange, debenture, certificate of indebtedness, mortgage, deed of trust, bank loan agreement, or conditional sales contract. * * * "

other. An instrument is that which by its terms it purports to be and once made it continues unchanged unless modified or terminated. The obligation which it evidences, however, may change from time to time as events occur. For instance an instrument may be a guaranty if by its terms it purports to evidence a promise to answer for the debt, default or miscarriage of another. The conditional nature of the promise is the very essence of the obligation of the guarantor, yet it is no less a guaranty if the condition occurs and the promise of the guarantor becomes unconditional. A lease containing a conditional obligation to pay rent does not become something else when an installment of rent becomes due and the tenant's obligation to pay it becomes unconditional.

In the instant case the license agreements and the modification agreements when taken together purport to evidence an agreement of sale. By their terms the buyer agrees to buy and the seller agrees to sell a thing of value for a designated consideration to be paid for according to the terms therein set forth. These are the typical provisions of sales agreements and they were intended to be such as indicated by the recitals in the modification agreements. According to their terms, the obligation to pay was conditioned upon performance by the sellers. If the sellers fully perform, the obligation of the buyer to pay may become unconditional, but the instruments which evidence such obligations are still the same agreements of sale which purport to evidence a conditional promise to pay. They do not become notes as respondent contends, for a note is an instrument which *by its terms purports to evidence* an unconditional promise to pay. Bernard Realty Co. v. United States, C.A.7, 188 F.2d 861; Consolidated Goldacres Co. v. Commissioner of Internal Revenue, C.A.10, 165 F.2d 542.

Congress has by precise language chosen certain instruments which are to be included in excess profits tax computations. In the absence of some special definition these terms should be given their ordinary meaning in common usage. Consolidated Goldacres, supra; Bernard Realty, supra. Both in common usage and in legal definition an "agreement of sale" and a "note" have very separate and distinct meanings.

We hold, therefore, that the instruments with which we are here dealing, when taken together, do not constitute notes within the meaning of Section 439 and that the Tax Court properly disallowed their inclusion in the petitioners' excess profits taxes computation.

The decision of the Tax Court is affirmed.