NEWTON INSERT COMPANY, TRANSFEROR, AND TRIDAIR INDUSTRIES, TRANSFEREE, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 7786–70.     Filed January 30, 1974.

*Thomas R. Sheppard* and *Allan I. Grossman,* for the petitioners.
*H. Lloyd Nearing,* for the respondent.

OPINION

Scott, *Judge:* Respondent determined that Tridair Industries was liable as transferee for a deficiency of $444,779 for the taxable year ended October 31, 1967, of its transferor, Newton Insert Co. (hereinafter Newton). Newton was dissolved and its assets transferred to Tridair Industries on October 31, 1967, in liquidation under the provisions of section 332(b), I.R.C. 1954,[1] to which section 334(b) was applicable.

The sole issue for decision is whether percentage payments made by Newton to Robert Neuschotz, City of Hope, and Marvin Best under 1961 and 1966 licensing agreements represent depreciation of patents acquired thereunder which amounts are subject to recapture under section 1245.

All of the facts have been stipulated and are found accordingly.

Tridair Industries (hereinafter petitioner) is a California corporation with its principal office in Redondo Beach, Calif. Petitioner is engaged in the design, manufacture, and sale of aircargo handling equipment, specialty fasteners, and inserts for original equipment manufacturers and consumers, and in the fabrication of fiberglass products.

Newton was a California corporation with its principal office in Los Angeles, Calif. Newton was engaged in the manufacture of threaded bushing inserts and studs used in structural applications. The primary function of inserts is to provide a strong thread in a soft or weak material (called a carrier), i.e., steel inserts are generally used in aluminum or magnesium parts to enable these parts to be joined to other parts by bolts. On July 10, 1967, petitioner purchased all the outstanding stock of Newton, consisting of 10 shares, from Marvin Best for $3,750,000 in cash. On October 31, 1967, Newton was liquidated into petitioner under section 332(b), and thereafter was operated as a division of petitioner. The basis to petitioner of the assets received from Newton was arrived at by allocating the adjusted basis to petitioner of the Newton stock, proratable to all Newton's assets, pursuant to section 334(b)(2).

Petitioner has executed a Form 2045 Transferee Agreement in which it became a transferee within the meaning of section 6901 to the extent of the deficiency at issue plus statutory interest.

On January 4, 1961, Robert Neuschotz was the president of Newton and owned 39.5 percent of the outstanding shares of common stock in his own name. He also owned 37.17 percent of the stock as trustee under the will of Lily Neuschotz, his deceased wife. In addition, 10.5 percent of the stock of Newton was owned by each of his two daughters

---

[1] All references are to the Internal Revenue Code of 1954.

and 2.33 percent of the shares was owned by City of Hope, a California nonprofit corporation.

On January 4, 1961, Neuschotz and City of Hope executed a document entitled "Grant and Agreement," which provided for the transfer to City of Hope of certain patents and patent applications relating to inventions developed by Neuschotz. The pertinent parts of the agreement read as follows:

WHEREAS, Neuschotz is the inventor of certain products, a list of which is hereby appended, marked Exhibit "A" and herein incorporated by reference, on which Letters Patent of the United States have heretofore issued or for which application has heretofore been made; and,

WHEREAS, it is the desire of Grantee to acquire and of Neuschotz to sell the said inventions (hereinafter referred to as "Patents" whether or not the patents have been issued thereon);

\* \* \* \* \* \* \*

2. *Grant.* Neuschotz does hereby give, grant, assign and transfer to Grantee the said Patents and each of them, including without limiting the foregoing, all of his right to make, use and sell in the United States of America, all products and to practice all processes utilizing or otherwise embodying the Patents.

3. *Consideration.* As consideration for the grant set forth in paragraph 2 hereof, the Grantee agrees to pay to Neuschotz, his transferees, licensees or assigns, payments computed in accordance with the following schedule:

An amount equal to five percent (5%) of the "net sales", as that term is hereinafter defined.

For the purposes of this agreement "net sales" and "net sales of the Patents", as those terms are used herein, shall mean the "gross sales" by the Grantee and any of its Licensees (such sales by Licensees being included in accordance with the provisions of paragraph 8), excluding all sales taxes and manufacturers' excise taxes, and minus a deduction of sales and returns and allowances credited in lieu of cash payments on returned merchandise.

\* \* \* \* \* \* \*

6. *Trademarks.* Should any Trademark be adopted by any licensee for any Patent covered hereby, such Trademark shall not become the property of Neuschotz, nor need the Grantee contract for ownership of the same.

\* \* \* \* \* \* \*

8. *Licenses.* Grantee contemplates that it may license others to make, use and sell all products and to practice all processes utilizing or otherwise embodying the Patents. In the event Grantee grants any such license, a sale by any licensee shall be considered a sale by Grantee for the purpose of computing payments owing to Neuschotz; provided, however, that Grantee shall contractually obligate each such licensee to make periodic accountings and payments to Grantee not less frequently than required by the provisions of paragraph 4 of this Agreement, and Grantee shall account and pay to Neuschotz, his transferees, licensees or assigns, on the basis of such accountings. No royalty-free license or foreign licenses shall or may be issued by Grantee without the written consent of Neuschotz.

9. *Warranty.* Neuschotz warrants and represents that the Patents, and each of them, referred to on Exhibit "A", are his alone, and no other person, firm

or corporation has any right, title or interest therein. Neuschotz agrees to and does hereby indemnify and hold harmless the Grantee from all loss, liability, cost or expense incurred by the Grantee by reason of the untruthfulness of any representation or warranty in this paragraph contained, or by reason of any claim made by any third person that the Patents, or any of them, infringe the patents of others.

The agreement further provided that Neuschotz would pursue all patent applications at his own expense and such patents when issued would be deemed transferred under the agreement to City of Hope.

The grant and agreement covered seven patents and four patent applications, one of the patents being a principal Newton product known as a "Keensert." The unique feature of a Keensert is that after insertion into the carrier it can be locked into place by the use of locking keys which will prevent further rotation.

On the same day and covering the same patents as the grant and agreement above set forth in part City of Hope and Newton executed a document entitled "Agreement" (hereinafter 1961 license agreement) which provided in part as follows:

WHEREAS, the Licensor [City of Hope] is the owner of certain patents and/or patent applications, a list of which is attached hereto, marked Exhibit "A", and herein incorporated by reference, and

WHEREAS, it is the desire of the Licensee [Newton] to secure an exclusive license to make, use and sell products and to utilize processes referred to in or covered by said patents or patent applications, as the case may be. For convenience the patents and patent applications will be generically referred to hereinafter as "Patents".

THE PARTIES AGREE as follows:

1. GRANT. The Licensor hereby grants to the Licensee an exclusive right to make, use and sell products and to utilize the processes disclosed in the Patents, for the full term of the last maturing patent referred to on Exhibit "A". The Licensee agrees that any modifications, changes, improvements or additions to the said Patents, or any of them, made or acquired by the Licensor during the life of this Agreement shall come under all of the terms of this Agreement, and title thereto shall pass to the Licensor. In this connection Licensee agrees to execute such further and other assignments thereof as may be appropriate in the circumstances.

2. CONSIDERATION. In consideration for the foregoing, the Licensee will pay to the Licensor an amount equal to six percent (6%) of the net sales of each of the patents, for the term hereinabove described.

For the purposes of this agreement "net sales" and "net sales of the Patents", as those terms are used herein, shall mean the "gross sales" by the Licensee, excluding all sales taxes and manufacturers' excise taxes, and minus a deduction of sales returns and allowances credited in lieu of cash payments on returned merchandise.

3. CERTAIN DUTIES OF LICENSEE. Licensee agrees to use its best efforts to promote the use and sale of products manufactured under or pursuant to the Patents, to keep true and accurate books of account, and to render reports for each month within thirty (30) days after the end of each calendar month for which any payment is due. Such report will be accompanied by the remittance

of the amount shown due thereby. Licensee agrees that it will keep true and accurate books of account reflecting all sales of and under the Patents, and the Licensor shall have the right and may authorize others to utilize the right to examine such books and records at all reasonable times, but not oftener than four times per year, for the purpose of verifying the accountings hereunder.

\*     \*     \*     \*     \*     \*     \*

5. INDEMNITY ON ACCOUNT OF DEFECTIVE PRODUCTS. Licensee agrees to and does hereby indemnify and save harmless the Licensor of and from any loss, cost, damage, liability or expense, including attorney's fees, arising out of or connected with any claim made by any person, firm or corporation, that the products manufactured pursuant to this license, and/or any of them, is defective. Licensee further agrees to indemnify and save harmless the Licensor of and from any claims made by others that any of the products manufactured pursuant to the license herein granted, shall and do constitute an infringement of letters patent issued to others, it being understood and agreed in this connection that any actions instituted by the Licensee on account of any claimed violation by others of any patent rights

(a) May be at Licensee's sole cost and expense and in the name of Licensor, or otherwise;

(b) May be solely at Licensee's cost and expense; and

(c) Licensee may keep and retain for its own use and benefit all recoveries, if any, made in any such action or proceeding.

Under the 1961 license agreement, Newton utilized three of the seven patents in manufacturing products between January 1, 1962, and October 31, 1967. Of the four patent applications, two were abandoned and two matured into patents, one issued on April 28, 1964, and the other issued on December 1, 1964. One of these covered the manufacture of the "Speedsert," which is a self-threading device that can be inserted into an unthreaded hole in the carrier. The Speedsert is another principal Newton product.

On February 16, 1962, Neuschotz sold 10 shares of Newton stock to Marvin Best. Subsequently, on October 19, 1965, all shares of stock except those owned by Marvin Best were redeemed by Newton for $332,500.

In 1965 an audit of Neuschotz's Federal income tax returns for the years 1961, 1962, and 1963 was made by an internal revenue agent. The agent questioned Neuschotz's reporting of royalties received by him under the 1961 license agreement as capital gain, on the grounds that the transfer of the patent rights to City of Hope and subsequent license given Newton was in substance an "indirect" transfer from Neuschotz to Newton within the meaning of section 1235(d). Neuschotz and representatives of the Internal Revenue Service settled this issue on March 16, 1965. The settlement provided that amounts received by Neuschotz for the years 1961 through 1963 as transferor of the patents were to be treated as ordinary income, while amounts received by him for those years as income beneficiary of the "Trust

under the Will of Lily Neuschotz," his deceased wife, were entitled to capital gains treatment. The basis for capital gains treatment of part of the payments was that Lily Neuschotz was deemed to have had a one-half community property interest in a pending patent application which after her death in 1956 developed into the basic Keensert patent. This interest passed under her will to the aforementioned trust, and payments made in consideration of its transfer to City of Hope were received by Neuschotz as sole income beneficiary under the trust.

On January 28, 1966, Newton and City of Hope in a letter agreement which was made effective retroactively to January 4, 1961, amended the grant and agreement which the parties had executed on that earlier date to provide that:

1. You [City of Hope] shall have the right at the expiration of any calendar year hereafter ensuing to render the license agreement non-exclusive unless we [Newton] shall have paid you within said calendar year minimum royalties aggregating not less than $25,000.00.

2. Should you elect to render such license agreement non-exclusive pursuant to the option hereinabove given to you, we shall be released from any duty to indemnify or save you harmless in consequence of any claims made by others that the products manufactured pursuant to such license agreement constitute an infringement of Letters Patent issued to others.

On June 30, 1966, City of Hope and Marvin Best executed an agreement which provided in part as follows:

WHEREAS, it is the desire of City of Hope to sell and of Best to buy all right, title and interest of City of Hope in and to its rights under said Grant, including, without being limited to, the patents referred to in said Grant,

NOW, THEREFORE, THE PARTIES AGREE AS FOLLOWS:

1. City of Hope hereby transfers, sets over and assigns to Best all and the entire right, title and interest heretofore acquired by it in, to and under the Grant, expressly subject, however, to the following:

(i) The rights of Newton Insert Company, as licensee under a Patent License Agreement between Newton Insert Company and City of Hope, executed on or about January 4, 1961, and

(ii) The rights of Robert Neuschotz, the grantor named in said Grant.

2. As full and final consideration for the conveyance herein made, Best agrees to pay to City of Hope the sum of $80,000.00 in 120 equal monthly installments commencing on the first day of July, 1966.

On July 1, 1966, Neuschotz and Newton executed a document entitled "Exclusive License Agreement" (hereinafter referred to as 1966 license agreement), which agreement was further amended on July 2, 1966. The final agreement granted the licensee, Newton, "the exclusive right, license and privilege to manufacture, use, sell, and lease, and to grant sublicenses to manufacture, use, sell, and lease, throughout the world, products, apparatus, and processes," covered by 15 new patents and 18 new patent applications. Included among these was

a patent issued on November 3, 1970, which related to the manufacture of Keenserts with an improved barb-type key. Thereafter, most Keenserts were manufactured under this new patent. Newton paid amounts under this agreement to Neuschotz on all products and apparatus which it sold or leased under the agreement, in the amount of 6 percent of the net selling price or net leasing price. The 1966 license agreement provided also for minimum royalties, at the rate of $75,000 per year for each of the first 5 years following the execution of the agreement, and at the rate of $60,000 per year thereafter until the date of expiration of the last-to-expire letters patent already issued at the time of the execution of the agreement or until the total of all payments received by Neuschotz under the agreement reached an aggregate of $1,095,000, at which time Newton would be relieved of the responsibility for minimum royalties. During the period January 1, 1962, to October 31, 1967, Newton paid the following sums under the licensing agreements:

| Period ended Oct. 31— | 1961 license agreement | 1966 license agreement | Total |
|---|---|---|---|
| 1962 | $77,095.74 | 0 | $77,095.74 |
| 1963 | 116,476.19 | 0 | 116,476.19 |
| 1964 | 116,441.91 | 0 | 116,441.91 |
| 1965 | 138,439.33 | 0 | 138,439.33 |
| 1966 | 174,597.67 | $24,999.94 | 199,597.61 |
| 1967 | 163,796.70 | 75,047.73 | 238,844.43 |
| Total | 786,847.54 | 100,047.67 | 886,895.21 |

The following percentages represent that portion of the total royalties paid by Newton under the 1961 license agreement deemed to pass through the trust established under the will of Lily Neuschotz:

| Year | Percentages | Year | Percentages |
|---|---|---|---|
| 1962 | 50.6 | 1965 | 36.2 |
| 1963 | 42.9 | 1966 | 36.8 |
| 1964 | 36.2 | 1967 | 41.5 |

Newton did not treat the license agreements or underlying patents and patent applications as capital assets in its books, nor did it record on its books or claim as a deduction on its Federal income tax returns any depreciation attributable to such patents and patent applications. Newton at no time capitalized research and experimental expenses in connection with the patents or patent applications as permitted under section 174(b). On its Federal income tax returns for fiscal years ending October 31, 1962, through October 31, 1967, Newton deducted the amounts due and paid under the license agreements for each respective year as "royalties," carrying the expenses under the heading of "Other Deductions." Newton's Federal income tax return for the fiscal year

ended October 31, 1965, was audited by an agent of the Internal Revenue Service and accepted as filed by the Internal Revenue Service.

The patents used in products manufactured by Newton during the period January 1, 1962, through October 31, 1967, which fall under the 1961 license agreement, had an aggregate fair market value as of November 1, 1967, of $569,500. Patents not used in products manufactured by Newton during this period and covered by the 1961 license agreement had an aggregate fair market value of $103,000.

The fair market value of the patents and other inventions covered by the 1966 license agreement was $1,514,000 as of November 1, 1967.

The projected sales figures used in arriving at the above fair market values of the license agreements would have generated required payments under the license agreements of approximately $1,754,000 through October 1, 1972.

Respondent in his computation of Newton's tax liability in his notice of transferee liability to petitioner determined that Newton had income for its fiscal year ended October 31, 1967, from "depreciation recapture" of $926,623. On brief respondent concedes that any depreciation recapture is limited to $569,500 with respect to the patents covered by the 1961 agreement and $100,047.67 as to the patents covered by the 1966 agreement.

Section 1245 [2] provides that if personal property of a taxpayer of a character subject to depreciation or amortization is disposed of during a taxable year beginning after December 31, 1962, the excess of

---

[2] SEC. 1245. GAIN FROM DISPOSITIONS OF CERTAIN DEPRECIABLE PROPERTY.

(a) GENERAL RULE.—

(1) ORDINARY INCOME.—Except as otherwise provided in this section, if section 1245 property is disposed of during a taxable year beginning after December 31, 1962, the amount by which the lower of—

(A) the recomputed basis of the property, or

(B) (i) in the case of a sale, exchange, or involuntary conversion, the amount realized, or

(ii) in the case of any other disposition, the fair market value of such property, exceeds the adjusted basis of such property shall be treated as gain from the sale or exchange of property which is neither a capital asset nor property described in section 1231. Such gain shall be recognized notwithstanding any other provision of this subtitle.

(2) RECOMPUTED BASIS.—For purposes of this section, the term "recomputed basis" means—

(A) with respect to any property referred to in paragraph (3) (A) or (B), its adjusted basis recomputed by adding thereto all adjustments, attributable to periods after December 31, 1961, * * *

*       *       *       *       *       *       *

reflected in such adjusted basis on account of deductions (whether in respect of the same or other property) allowed or allowable to the taxpayer or to any other person for depreciation, or for amortization under section 168, 169, 184, 185, or 187. For purposes of the preceding sentence, if the taxpayer can establish by adequate records or other sufficient evidence that the amount allowed for depreciation, or for amortization under section 168, 169, 184, 185, or 187, for any period was less than the amount allowable, the amount added for such period shall be the amount allowed.

(3) SECTION 1245 PROPERTY.—For purposes of this section, the term "section 1245 property" means any property which is or has been property of a character subject to

(1) the recomputed basis of the property, or (2) in case of a sale, exchange, or involuntary conversion, the amount realized, or (3) in the case of any other disposition, the fair market value of the property over the adjusted basis of the property shall be treated as gain from the sale or exchange of property which is neither a capital asset nor property described in section 1231.

Section 1.1245–3(b), Income Tax Regs.,[3] includes within the definition of personal property, intangible personal property. Petitioner does not contest the validity of this regulation but accepts the fact that if Newton owned the patents covered by the 1961 and 1966 agreements so that those patents were intangible personal property subject to depreciation in Newton's hands, they are personal property within the provisions of section 1245. The parties agree that the disposition of Newton's rights in the patents to petitioner upon Newton's liquidation in accordance with the provisions of section 332(b) is a disposition of property to which section 1245 is applicable because petitioner's basis for Newton's assets was not a carryover basis but a basis determined under section 334(b)(2).

Petitioner concedes that the 1966 license agreement constituted a sale of the patents covered thereby to Newton and therefore those patents were depreciable assets in Newton's hands, but takes issue with respondent's determination of the amount of this depreciation which is recapturable.

Petitioner contends, however, that the 1961 license agreement was a license and did not amount to a sale of patent rights and therefore Newton acquired no depreciable intangible property under the 1961 agreement but that the payments by Newton to Neuschotz under this agreement were merely for the use of a capital asset and are deductible business expenses. Sec. 162(a)(3).

The 1961 license agreement granted Newton the "exclusive right to make, use and sell the products and to utilize the processes disclosed

---

the allowance for depreciation provided in section 167 (or subject to the allowance of amortization provided in section 185) and is either—

    (A) personal property,

    (B) other property (not including a building or its structural components) but only if such other property is tangible and has an adjusted basis in which there are reflected adjustments described in paragraph (2) for a period in which such property (or other property)—

        (i) was used as an integral part of manufacturing, production, or extraction or of furnishing transportation, communications, electrical energy, gas, water, or sewage disposal services, or

        (ii) constituted research or storage facilities used in connection with any of the activities referred to in clause (i),

[3] Sec. 1.1245–3(b) *Personal property defined.* The term "personal property" means—

    (1) Tangible personal property (as defined in paragraph (c) of § 1.48–1, relating to the definition of "section 38 property" for purposes of the investment credit), and

    (2) Intangible personal property.

in the Patents for the full term of the last maturing patent." These terms are identical in impact to the language stated in *Waterman* v. *MacKenzie*, 138 U.S. 252 (1891), to be necessary to effect a sale of a patent. There, the Supreme Court found that a patent was composed of the "exclusive right to make, use and vend an invention," and "the granting of an exclusive right under the patent * * * which does not include the right to make, and the right to use, and the right to sell, is not the grant of a title in the whole patent * * * and is therefore only a license." However, a transfer of the rights to make, use, and vend amounts to a transfer of all substantial rights to a patent, and has consistently been deemed to be a sale. *Edward C. Myers*, 6 T.C. 258 (1946); *Lockhart* v. *Commissioner*, 258 F. 2d 343, 349 (C.A. 3, 1958), affirming in part and reversing in part a Memorandum Opinion of this Court. Whether there has been a transfer of all substantial rights depends upon the facts and circumstances of each case. *Rose Marie Reid*, 26 T.C. 622, 632 (1956). The use of the terms "licensor" and "licensee" in the agreement is not controlling. *Rose Marie Reid, supra*, and *Edward C. Myers, supra*.

The 1961 license agreement unequivocally granted to Newton the three substantial rights necessary to a sale of a patent. City of Hope did not reserve any right which might preclude our finding a sale of the patents.

Examples of substantial rights retained by a transferor include the right to terminate the agreement with or without cause, *Bell Intercontinental Corporation* v. *United States*, 381 F. 2d 1004, 1020–1021 (Ct. Cl. 1967); rights to grant a nonexclusive license to another firm and to compel the transferee to sublicense another, *Allied Chemical Corporation* v. *United States*, 370 F. 2d 697 (C.A. 2, 1967); and the right to prohibit assignment of the agreement without the transferor's written consent. *Oak Manufacturing Co.* v. *United States*, 301 F. 2d 259, 262 (C.A. 7, 1962).

The provisions of the 1961 license agreement clearly did not reserve any such right to City of Hope. The obligation which the agreement imposed on Newton to use its best efforts to promote the sale of products manufactured under the patents and the requirement that Newton utilize appropriate accounting methods and allow City of Hope access to Newton's books of account, were simply provisions included to protect City of Hope's right to compensation under the agreement. Such provisions provide security for the transferor, but do not cause there to be no transfer of ownership.

Petitioner makes some argument that even though there was no retention of a substantial right in the patents by City of Hope, since there was no affirmative statement in the agreement that City of Hope

granted Newton the right to sublicense others to utilize the patents, this right was not granted to Newton by the agreement. In our view an unlimited transfer of the exclusive rights to use, manufacture, and sell for the life of the patent would automatically include the right to authorize others to use, manufacture, and sell. Furthermore, even if the agreement could be interpreted as not granting to Newton the right to sublicense, the failure to grant Newton the right to sublicense does not result in the reservation of a substantial right to City of Hope, since City of Hope was foreclosed from granting other licenses by the exclusiveness of Newton's license.

The case of *Harrison* v. *Schaffner*, 312 U.S. 579 (1941), relied on by petitioner, which deals with the right of a life beneficiary of a testamentary trust to assign income, is clearly distinguishable. *Oak Manufacturing Co.* v. *United States, supra*, also relied on by petitioner, is likewise distinguishable on its facts from this case. The facts in that case showed that the parties had intended to establish an agency relationship for the distribution of the taxpayer's products, rather than to sell the patents.

Finally, even were we to find that the failure to grant permission to sublicense others meant that Newton had to obtain the consent of City of Hope before doing so, this alone has been held not to amount to the reservation of a substantial right so as to preclude a sale. *Watson* v. *United States*, 222 F. 2d 689, 691 (C.A. 10, 1955).

Petitioner further contends that the 1961 license agreement was not a sale because some of the patents later covered by the agreement were not in existence in 1961. However, we have held that it is not significant in determining whether an agreement constitutes a sale of a patent that a patent has not been issued or even applied for at the time that all substantial rights are transferred. *Estate of Milton P. Laurent, Sr.*, 34 T.C. 385 (1960).

The letter amendment of January 28, 1966, to the 1961 agreement, effective as of January 4, 1961, which amendment provided that the license granted would become nonexclusive if minimum royalties of $25,000 were not paid to City of Hope annually does not cause the 1961 agreement not to be a sale of the patents. Assuming the retroactive effectiveness of the amendment, this clause merely established a condition subsequent, which does not negate a sale. *Allen* v. *Werner*, 190 F. 2d 840 (C.A. 5, 1951); *Commissioner* v. *Celanese Corp.*, 140 F. 2d 339 (C.A.D.C. 1944), affirming a Memorandum Opinion of this Court.

Having reviewed the transaction both from the standpoint of what was transferred, as well as what was retained, we find that the broad and unlimited language contained in the 1961 license agreement shows that the parties thereto intended a sale of the patents. *Watson* v. *United States, supra*, and *Rose Marie Reid, supra*.

Petitioner contends that if we find from the terms of the agreement that there was a sale, Newton was nevertheless entitled to treat the transaction as a mere license because the amounts paid under the license agreements were contingent and not fixed. This argument of petitioner is without merit. The Court has stated that a taxpayer which was paying a percentage of sales for use of a patent was entitled to deduct the percentage payments either because the sums were ordinary and necessary expenses paid for the use of the invention or because they represented depreciation allowable on the purchased invention.[4] This statement was merely a recognition that it was unnecessary to determine in the particular case whether the amounts are deductible as royalties or as depreciation since the licensee was entitled to a deduction for the amount as a business expense *if* the agreement between the parties was a mere license or to a deduction of the same amount as depreciation of a capital asset *if* the agreement was the sale of the invention. This statement in no way indicates that where there has been a sale of the patents, the purchaser has the choice of characterizing the deduction of the percentage payments made as royalties deductible under section 162 or as depreciation deductible under section 167. We have held to the contrary. In *Associated Patentees, Inc.*, 4 T.C. 979 (1945), we held that since a transfer of patents in return for 80 percent of the income generated by their use was found to be a purchase of capital assets with a determinable useful life, the purchaser was entitled to deduct the percentage payments, but only as depreciation of the cost of the patents.

Petitioner relies on the case of *McCullough Tool Co.*, 33 T.C. 743 (1963), affirmed on another issue 318 F. 2d 790 (C.A. 9, 1963), acq. 1964-1 C.B. 5, to support its contention that in the absence of a fixed cost for the patent, a licensee under an exclusive license may deduct percentage payments as business expenses under section 162. The Court in *McCullough* found that the agreement there involved, as modified, was a sale of the patents for a fixed price and, in light of that determination, saw no basis for denying the taxpayer a depreciation deduction on the assets purchased. The Court was not required to pass on the argument of the Government that depreciation could not be taken on assets purchased on a percentage of sales or production basis since under such circumstances the patents had no fixed cost susceptible of depreciation.

Petitioner contends that the 1966 agreement between City of Hope and Marvin Best, which transferred the former's rights under its 1961 agreement with Neuschotz to Best for $80,000 shows that City of Hope could not have intended in 1961 to transfer ownership of the patents

---

[4] Petitioner relies on *M. E. Cunningham Co.*, T. C. Memo. 1951-81.

to Newton. The agreement between City of Hope and Best does not support petitioner's position. City of Hope transferred its interest to Best subject to Newton's rights. In our view the agreement transferred to Best only City of Hope's 1-percent royalty interest in the patents and in no way affected Newton's ownership of all rights in the patents.

Petitioner's final argument is that the provisions of section 1235 preclude the possibility that the 1961 license agreement could effect a sale of the underlying inventions.

Section 1235, enacted in 1954, deals with the tax treatment of payments received by a "holder" as consideration for his transfer of all substantial rights to a patent, where the payments are contingent upon the productivity of the patent or payable periodically over the period the patent is used by the transferee.[5] Prior to the enactment of section 1235, the Government had contended, generally unsuccessfully, in certain cases that transactions transferring patents for contingent rather than fixed amounts were licenses and not sales, and that transferors of patents on such terms were not entitled to treat the payments which they received as capital gains. See *Leonard Coplan*, 28 T.C. 1189, 1191 (1957), for a discussion of changes in the positions taken by the Government in this regard.

Section 1235 was enacted to clarify the tax treatment of percentage payments to inventors and their financial backers, and to allow persons whose efforts led to the development of valuable inventions capital gains treatment on the sale or assignment of the underlying patents,

---

[5] SEC. 1235. SALE OR EXCHANGE OF PATENTS.

(a) GENERAL.—A transfer (other than by gift, inheritance, or devise) of property consisting of all substantial rights to a patent, or an undivided interest therein which includes a part of all such rights, by any holder shall be considered the sale or exchange of a capital asset held for more than 6 months, regardless of whether or not payments in consideration of such transfer are—

    (1) payable periodically over a period generally coterminous with the transferee's use of the patent, or

    (2) contingent on the productivity, use, or disposition of the property transferred.

(b) "HOLDER" DEFINED.—For purposes of this section, the term "holder" means—

    (1) any individual whose efforts created such property, or

    (2) any other individual who has acquired his interest in such property in exchange for consideration in money or money's worth paid to such creator prior to actual reduction to practice of the invention covered by the patent, if such individual is neither—

        (A) the employer of such creator, nor

        (B) related to such creator (within the meaning of subsection (d)).

(c) EFFECTIVE DATE.—This section shall be applicable with regard to any amounts received, or payments made, pursuant to a transfer described in subsection (a) in any taxable year to which this subtitle applies, regardless of the taxable year in which such transfer occurred.

(d) RELATED PERSONS.—Subsection (a) shall not apply to any transfer, directly or indirectly, between persons specified within any one of the paragraphs of section 267(b); except that, in applying section 267(b) and (c) for purposes of this section—

    (1) the phrase "25 percent or more" shall be substituted for the phrase "more than 50 percent" each place it appears in section 267(b), and

    (2) paragraph (4) of section 267(c) shall be treated as providing that the family of an individual shall include only his spouse, ancestors, and lineal descendants.

regardless of the mode of payment involved and whether the inventor was in the business of inventing. The substance of the provisions is that a transfer shall be deemed a sale or exchange of a capital asset held for more than 6 months—and, consequently, result in long-term capital gain—where enumerated conditions are met.

In S. Rept. No. 1622, to accompany H.R. 8300 (Pub. L. No. 591), 83d Cong., 2d Sess., p. 441, the statement is made that:

It is the intention of your committee that, *if the mode of payment* is as described in subsection (a) [of Sec. 1235] * * * the sale of a patent by any *"holder"* must qualify under the section in order for such *"holder"* to obtain capital gain treatment. [Emphasis supplied.]

In *Myron C. Poole*, 46 T.C. 392 (1966), cited by petitioner, the issue was whether Poole, an inventor, was entitled to capital gains treatment. Poole was a "holder" under section 1235, and he transferred his rights to a patent to an intermediary corporation, which then granted an exclusive license to a corporation controlled by him. Both transfers were for consideration contingent upon production of the inventions under the patent. We found that Poole had made an indirect transfer of all substantial rights to the patent to his controlled corporation, a "related" entity within the meaning of section 1235(d). Accordingly, we held that Poole was not entitled to treat the payments he received as capital gains under section 1235, and the payments which he received from the transfer were taxable to him as ordinary income. Having found that section 1235(a) did not apply to cause the payments Poole received to be capital gains, we held against Poole on his alternative contention that he was entitled to capital gains treatment under other sections of the Code. We explained our conclusion as follows (at pp. 404–405):

The legislative history with respect to section 1235 explains that a holder's recourse to prior case law is proper only when the transaction is not one described in section 1235(a). In other words, if the payments for a patent are contingent upon productivity, use, or disposition, or if they are payable periodically over a period generally coterminous with the transferee's use of the patent, section 1235 is the holder's exclusive provision for qualifying for capital gains treatment. Moreover, this interpretation of the effect of section 1235 is supported by an analysis of the effect of the provisions of the section. If a holder transfers a patent resulting in the payment of royalties in the manner described in section 1235(a) to a related person, and if we were to hold that such a transfer is entitled to capital gains treatment under another provision of law, we would be nullifying section 1235(d). Since section 1235(d) was included in the law, it must have been done for a purpose—the purpose of denying capital gains treatment to a holder's transfer to related persons when the payments are of the type described in section 1235(a). [Fn. omitted.]

Petitioner contends that the excerpt from the *Poole* case defining the scope of section 1235 should be applied to this case in such a manner as to support the conclusion that Newton had not purchased the patents

and was not the owner of the patents. There are factual similarities between the *Poole* case and the instant case. Here, the inventor, Neuschotz, was a "holder" of the patent rights transferred by the 1961 agreement within the meaning of section 1235 (b) (1) and, with regard to Newton, Neuschotz was a "related person" within the meaning of section 1235 (d) (1). Also, the transfer of patent rights to City of Hope and the simultaneous execution of the 1961 license agreement between City of Hope and Newton could have constituted an "indirect transfer" within the meaning of section 1235 (d) between related parties as we held the tranfer in the *Poole* case did. However, it does not follow, as petitioner contends, that the failure of Neuschotz to qualify for capital gains treatment under section 1235 results not only in denying Neuschotz capital gains treatment but also rules out the possibility of the transfer being a sale. If we assume that there was an "indirect transfer" from Neuschotz to Newton so that Neuschotz would be denied capital gains treatment on the payments he received from Newton, it does not follow that the transfer from Neuschotz to Newton was a license and not a sale.

Section 1235 governs when a holder, as defined therein, is entitled to capital gains treatment, but it does not purport to govern with respect to any other party or situation when the transfer of patents for consideration contingent upon productivity amounts to a sale.

The wording of the statute and the legislative history of section 1235 indicate that Congress did not intend to define what constituted a sale of patents, but rather that the purpose behind the enactment of section 1235 was to clarify, and in several cases to extend capital gains treatment to "holders." Section 1235 allows capital gains to professional as well as amateur inventors. It does away with the 6-month holding period required ordinarily for long-term capital gains and it deemphasizes the mode of payment in deciding the effect of a transaction. There is not, however, any indication that Congress was attempting to change existing principles of law which have long determined what is a sale of patents.

The report of the Senate Finance Committee, S. Rept. No. 1622, *supra*, states that the purpose of the legislation was to "give statutory assurance to certain patent holders that the sale of a patent (whether as an 'assignment' or 'exclusive license') shall not be deemed *not* to constitute a 'sale or exchange' for tax purposes solely on account of the mode of payment." (Emphasis supplied.) This language indicates that Congress was concerned with the position which had been taken by the Government that certain transfers were not sales or exchanges of a patent because of payment being contingent on production. The Senate committee report in no way supports petitioner's position that the transfer of a patent will be characterized as a mere license *solely*

on account of the fact that payments made in consideration of such transfer resemble generally payments of royalties or that failure of the holder who transfers the patent to qualify under section 1235 for capital gain treatment of the payments he receives will result in the transfer not being a sale to the assignee of the rights.

The following language, from S. Rept. No. 1622, *supra* at pp. 439–440, indicates that Congress intended that previously developed criteria be used in determining what constitutes a sale:

The section [1235] does not detail precisely what constitutes the formal components of a sale or exchange of patent rights beyond requiring that all substantial rights evidenced by the patent (other than the right to such periodic or contingent payments) should be transferred to the transferee for consideration. This requirement recognizes the basic criteria of a "sale or exchange" under existing law, with the exception noted relating to contingent payments, which exception is justified in the patent area for "holders" as herein defined. To illustrate, exclusive licenses to manufacture, use, and sell for the life of the patent, are considered to be "sales or exchanges" because, in substantive effect, all "right, title, and interest" in the patent property is transferred (irrespective of the location of legal title or other formalities of language contained in the license agreement). Moreover, the courts have recognized that an exclusive license agreement in some instances may constitute a sale for tax purposes even where the right to "use" the invention has not been conveyed to the licensee, if it is shown that such failure did not represent the retention of a substantial right under the patent by the licensor. It is the intention of your committee to continue this realistic test, whereby the entire transaction, regardless of formalities, should be examined in its factual context to determine whether or not substantially all rights of the owner in the patent property have been released to the transferee, rather than recognizing less relevant verbal touchstones. The word "title" is not employed because the retention of bare legal title in a transaction involving an exclusive license may not represent the retention of a substantial right in the patent property by the transferor. Furthermore, retention by the transferor of rights in the property which are not of the nature of rights evidenced by the patent and which are not inconsistent with the passage of ownership, such as a security interest (e.g., a vendor's lien) or a reservation in the nature of a condition subsequent (e.g., a forfeiture on account of nonperformance) are not to be considered as such a retention as will defeat the applicability of this section. On the other hand, a transfer terminable at will by the transferor would not qualify.

See also *Vincent B. Rodgers*, 51 T.C. 927, 931 (1969) ; *Puschelberg* v. *United States*, 330 F. 2d 56, 60 (C.A. 6, 1964). In *Max A. Burde*, 43 T.C. 252 (1964), affd. 352 F. 2d 995 (C.A. 2, 1965), we stated that a transfer of a patent which was a sale of the patent did not result in capital gains on the transfer to the transferor "holder" because of a relationship between the transferor and transferee which prohibited the payments from resulting in capital gains to the transferor under section 1235. However, throughout the opinion we characterized the transfer as a "sale" of the patents.

In our view there is nothing in the statute, the regulations, or the legislative history of section 1235 which indicates that a transfer de-

scribed in section 1235(a) cannot be a sale simply by reason of its being made to a related person. We hold that the 1961 agreement constituted a sale to Newton of the patents covered by that agreement.

Having concluded that the 1961 license agreement, as well as the 1966 agreement, constituted a sale of the patents enumerated therein to Newton, amounts paid by Newton annually to City of Hope, Best, and Neuschotz represent payments of the purchase price of intangible assets. Therefore, Newton was not entitled to deduct the payments made to City of Hope, Best, and Neuschotz as business expenses but was entitled to deductions for depreciation allowable under section 167. Section 167 provides that "There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear * * * (1) of property used in the trade or business." In *Associated Patentees, Inc., supra,* we held that where payment is made for purchase of a patent on a yearly percentage of production basis, a depreciation deduction of the total annual payment is allowable so that the purchaser will be able to recover the amount of the cost of the patent prorated equitably over its life.[6] This method takes into consideration the fact that since a patent purchased for percentage payments has no fixed cost, it is impossible to compute the depreciation allowance ratably over its useful life. Thus, permitting the yearly cost payment to be deducted in the year the payment is made provides minimum distortion of income. By this method, at the end of the life of the patent, the purchaser will have recovered the total cost of the asset. See also *Sarkes Tarzian, Inc.* v. *United States,* 159 F. Supp. 253 (S.D. Ind. 1958).

Respondent determined that under section 1245 the total of the percentage payments made by Newton pursuant to the license agreements is subject to recapture in 1967 when petitioner liquidated Newton into itself. A new basis to petitioner for the patents was established pursuant to section 334(b)(2) upon this liquidation, and the liquidation is a disposition of property to which section 1245 applies. Sec. 1.1245-4(c)(3), Income Tax Regs.[7] Petitioner contends that sec-

---

[6] There is nothing in this record to indicate that any of the payments made by Newton to City of Hope, Best, or Neuschotz were with respect to patent applications before issuance of the patent and therefore there is no issue with respect to the treatment of payments made for use of a process or manufacture of a product covered by a patent application prior to issuance of the patent.

[7] Sec. 1.1245-4(c)(3), Income Tax Regs.:

(3) *Complete liquidation of subsidiary.* In the case of a distribution in complete liquidation of an 80-percent-or-more controlled subsidiary to which section 332 applies, the limitation provided in section 1245(b)(3) is confined to instances in which the basis of the property in the hands of the transferee is determined, under section 334(b)(1), by reference to its basis in the hands of the transferor. * * * section 1245(b)(3) may apply in respect of a liquidating distribution of section 1245 property by an 80-percent-or-more controlled corporation to the parent corporation, but does not apply in respect of a liquidating distribution of section 1245 property to a minority shareholder. Section 1245(b)(3) does not apply to a liquidating distribution of property by an 80-percent-or-more controlled subsidiary to its parent if the parent's basis for the property is determined, under section 334(b)(2), by reference to its basis for the stock of the subsidiary.

tion 1245 generally and section 1245(a)(2) in particular, defining recomputed basis, do not apply here because no depreciation by Newton was "allowed" during the years 1962 to 1967 within the meaning of that term as set forth in *El Patio Co.*, 6 T.C. 1, 5 (1946), and *Virginian Hotel Corporation* v. *Helvering*, 319 U.S. 523 (1943). Those cases involved the effect of amounts allowed as depreciation under a settlement of a previous deficiency on the current income tax liability of the taxpayer and are distinguishable factually from the instant case. The holdings of those cases with respect to the definition of the term "allowed" are irrelevant to the issue in the instant case since section 1.1245–2(a)(7), Income Tax Regs., directs that, in determining recomputed basis under section 1245 all adjustments attributable to "allowed or allowable depreciation" are taken into consideration. That regulation further directs that the terms "allowed" and "allowable" are governed by the provisions of section 1016(a)(2), which section specifically provides for calculating the amount allowable where no depreciation deduction was claimed.[8] Sec. 1.1016–3(a)(2), Income Tax Regs. The fact that Newton did not record in its books depreciation taken on the patents does not preclude our finding that the amounts deducted under the erroneous label of "other deductions" were in fact properly allowable deductions as depreciation. *Associated Patentees, Inc.*, *supra*.

Petitioner further contends that to apply section 1245 to the purchase of patents where the purchase price is contingent, and not fixed, will pervert the legislative intent of that section. Petitioner points out that the intent of Congress, in enacting a provision to "recapture" depreciation, was aimed at recovering only that amount of depreciation deducted which exceeded the actual decline in value of the respective asset. However, in order to achieve this result, Congress set forth an objective, mathematical formula in section 1245 which was made applicable to depreciable personal property. Intangible personal property was not excluded from the provisions of section 1245, and section 1.1245–3(b)(2), Income Tax Regs., specifically includes in the definition of personal property "intangible" property. There is nothing in section 1245 to indicate that the absence of a fixed cost for patents

---

[8] SEC. 1016. ADJUSTMENTS TO BASIS.

(a) GENERAL RULE.—Proper adjustment in respect of the property shall in all cases be made—

\* \* \* \* \* \* \*

(2) in respect of any period since February 28, 1913, for exhaustion, wear and tear, obsolescence, amortization, and depletion, to the extent of the amount—

(A) allowed as deductions in computing taxable income under this subtitle or prior income tax laws, \* \* \*

\* \* \* \* \* \* \*

but not less than the amount allowable under this subtitle or prior income tax laws. Where no method has been adopted under section 167 (relating to depreciation deduction), the amount allowable shall be determined under section 167(b)(1). \* \* \*

justifies exempting their disposition from the application of section 1245.

Respondent computed the amount of recapture of depreciation by considering that Newton had no cost of the patents when they were acquired since no payment was due until the patents were used in Newton's production. Considering the basis of the patents to Newton when acquired to be zero, respondent applied precisely the formula set forth in section 1245 to determine the amount of recapture. Since each year the amount petitioner paid under the agreements is considered deductible as depreciation, at the end of each year Newton's adjusted basis in the patents is zero. Petitioner objects to respondent's use of a zero adjusted basis in the recapture computation. Petitioner concedes that the basis of an asset does not include contingent or indefinite amounts payable in the future such as royalties based on future earnings but contends that since the stipulated fair market value of the license agreements takes into consideration future earnings anticipated for the years 1967 through 1972, the basis of the license agreements should likewise be increased at least by the amount of future royalty payments estimated to be due after 1967. In our view this contention of petitioner lacks merit. The computation of the fair market value of the patents is an estimate of the price which a willing buyer would pay a willing seller allowing a reasonable length of time to find a knowing and willing buyer, and assuming a knowing and willing seller. It is the value which petitioner agreed to place on the license agreements at the time Newton was liquidated but it does not in any way affect the amount which petitioner will pay for the patents in the following years. Therefore, the fact that the estimate used 5-year earnings projections has no bearing on the 1967 cost basis of the patents.

We also find that respondent's use of a zero basis, aside from literally complying with the statute, reflects accurately the basis of the patents at the time of their disposition. At that time, future payments under the license agreements were contingent, and petitioner could not be certain that it would incur additional royalty costs. Therefore, petitioner cannot increase the basis of the agreements by speculative amounts which may never become due and which certainly Newton had not paid.

The more troublesome problem is whether section 1245 was intended to apply to dispositions of assets which had no fixed cost at the time of purchase. Section 1245 was enacted to correct the situation which arose when a buyer of property had written off its cost too rapidly or

had underestimated the property's useful life in computing the annual depreciation allowance. When these circumstances existed, certain inequities arose. The purpose of the provision as reflected in S. Rept. No. 1881, 87th Cong., 2d Sess. (1962), 1692–3 C.B. 801 was:

Wherever the depreciation deductions reduce the basis of the property faster than the actual decline in its value, then when it is sold there will be a gain. Under present law this gain is taxed as a capital gain, even though the depreciation deductions reduced ordinary income. The taxpayer who has taken excessive depreciation deductions and then sells an asset, therefore, has in effect converted ordinary income into a capital gain.

To correct this, section 1245 requires that a certain amount of the "gain" be treated as ordinary income. This amount in petitioner's case is the lower of (a) the fair market value of the property in excess of its basis, or (b) the full amount of depreciation taken after December 31, 1961. There is no special consideration given to a situation like the one before us, where the asset did not have a fixed cost. At the same time, the statute applies broadly to all personal property which is subject to a depreciation allowance under section 167, and there is no basis in the law for finding an intangible asset such as patents to be exempt from the provisions of section 1245.

As petitioner points out, applying the satutory formula to an asset without a fixed cost may result in recapture of amounts which would not ordinarily have been excessive depreciation. If Newton had continued to use the patents for their full lives, the depreciation allowable to Newton over the lives of the patents would have exactly equaled the cost to Newton of the patents. However, when Newton disposed of the patents to petitioner under the provisions of section 334(b) petitioner received a fixed basis for the patents in an amount of a pro rata part of the $3,750,000 which it paid for the Newton stock which it will be entitled to recover through depreciation proratable over the remaining useful lives of the patents. Since the basis of the patents in petitioner's hands was not determined by their basis in the hands of Newton, section 1245 is applicable by its terms to the disposition of the patents by Newton to petitioner. See sec. 1245(b)(3).

We hold for respondent except to the extent of the concession made by respondent as to the recapture as to the patents covered by the 1961 agreements being limited to $569,500, their fair market value on November 1, 1967, and the recapture as to the patents covered by the 1966 agreement being limited to $100,047.67.

Reviewed by the Court.

*Decision will be entered under Rule 155.*